## THE OREGON.

*(District Court, D. Oregon. January 5, 1891.)*

1. TORCH-LIGHT ON SAILING VESSEL.
   Section 4234, Rev. St., requiring sailing vessels to exhibit a torch-light on the approach of a steam-vessel at night, does not apply to foreign vessels in American waters; but good seamanship requires that such sail-vessels shall exhibit such light under such circumstances, whether in motion or at anchor, and a failure to do so in case of a collision may constitute contributory negligence on her part.

2. INTERVENTION IN ADMIRALTY.
   Any person may intervene in a suit in admiralty *in rem* for his interest, and he may do so notwithstanding the *res* has been delivered to a claimant on a stipulation in a certain sum to abide and perform the decree; the stipulation, as far as it goes, standing for the *res*.

3. SUIT IN ADMIRALTY FOR THE DEATH OF A HUMAN BEING.
   Under the statute of Oregon (§§ 371, 3690, Comp. 1887) giving a right of action to an administrator for the death of his intestate, and giving a lien on a vessel navigating the waters of the state, for any injury caused thereby, a suit in admiralty may be maintained in the United States district court for such death.

4. DIVISION OF DAMAGES WHERE BOTH VESSELS ARE IN FAULT.
   In such case the rule is to deduct the lesser loss from the greater, and to require the vessel sustaining the lesser to pay one-half of the remainder to the vessel sustaining the greater loss.

In Admiralty.
*C. E. S. Wood* and *Stuart B. Linthicum*, for libelant.
*W. W. Cotton* and *William B. Gilbert*, for claimant.

DEADY, J. This suit was commenced on December 27, 1889, by the libelant, John Simpson, master of the British ship Clan Mackenzie, hereinafter called the "C. M.," against the steam-ship Oregon, to recover damages resulting from a collision between the two vessels on the Columbia river, about 42 miles below Portland, and alleged to have been caused by the misconduct of the latter.

On the same day the Oregon was arrested on process of this court, and a monition to all persons interested therein was duly published.

On January 2, 1890, C. J. Smith filed a claim to the vessel on behalf of the corporation, the Oregon Short Line & Utah Northern Rail-

way Company, hereinafter called the "Short Line," as the charterer of the same for the period of 99 years from January 1, 1887; and she was then delivered by the marshal to the claimant, on a stipulation to abide and perform the decree of the court, in the sum of $260,000.

The libelant afterwards intervened, and filed a libel herein on behalf of himself and wife to recover damages alleged to have been sustained by them in the loss of their personal effects by the collision, in which were joined 18 of the crew of the C. M., each of whom alleged that he had suffered loss of the same kind and by the same means.

Mr. James Laidlaw, British vice-consul at this port, also intervened, as administrator of the estates of Charles Austin and Matthew Reed, and filed a libel herein, alleging that they were of the crew of the C. M. at the time of the collision, and that their deaths were caused by the misconduct of the Oregon on that occasion, and asking damages therefor as provided by the law of Oregon.

James Joseph, another of the crew of the C. M., intervened, and filed a libel herein, alleging that he was seriously injured by the collision, and asking damages therefor. The libelant, on January 14th, filed an amended libel, and on April 30th and May 14th, each, a supplemental one.

By order of the court under admiralty rule 34 the claimant was required to answer the libels of these intervenors, whereupon exceptions were taken to them, denying the right to intervene after the *res* (the vessel) was discharged from the arrest, which were overruled.

On May 24th answers were filed to the libels of the intervenors, denying that the alleged injuries and losses were the result of the misconduct of the Oregon, and alleging they were caused by the negligence of the C. M. The answer and amended answer to the principal libel, filed, respectively, February 3d and May 24th, are to the same effect.

From the evidence, the admissions in the pleadings, the stipulations of the parties, and a view of the vicinity of the collision, I find the material facts of the case to be as follows:

(1) Early in the forenoon of December 26, 1889, the C. M., an iron vessel of 2,500 tons burden, 259 feet in length, 38 feet beam, and 23 feet in the hold, was at Astoria, bound for Portland from Rio Janeiro, in ballast, in tow of the steam-boat Oklahoma, in charge of Henry Empkins, as master and pilot. About 8 o'clock in the evening the C. M. came to anchor on the Oregon side of the Columbia river in 5 fathoms of water, at 3 feet flood tide, and about 900 feet distant from and a little below a dock and wood-yard for steam-boats, called "Neer City," and about three-fourths of a mile below Goble's point, and a mile above Coffin rock. Immediately below this rock, and a short distance inside of it, on the face of a wooded promontory, a government light is and was then maintained at a height of about 30 feet from the water, with a radiating power of four miles. It is described by the light inspector of the district, Capt. William W. Rhoades, as a tubular lens lantern of one 100-candle power, and easily visible, on a dark, clear night, from three to four miles.

(2) The Oklahama and the steam-ship Oregon belonged to the Oregon corporation, the Oregon Railway & Navigation Company, hereinafter called the "Oregon Company," but was at the time in the possession and control of the Short Line, under a lease from the former, and operated by the Union Pacific. The master of the Oklahama anchored the C. M. on the edge of the ship channel, which is there near a half-mile wide at the mean of the lowest low waters, and well out of the usual track of the ocean steamers that ply between Portland and San Francisco, two of which, he told the master, were coming down the river that night; and also back and out of the range of Coffin Rock light. He directed the hanging of the anchor light, which was placed accordingly, in the fore-rigging on the starboard side, midway between the foremast and the shrouds, between 20 and 25 feet above the deck, and 35 and 40 feet above the water, and then proceeded with the Oklahama to the dock of the wood-yard, where she was tied up for the night, and took on a supply of wood.

(3) The C. M. had a white light in a copper lantern, with a globular, corrugated lens over eight inches in diameter, and it was in all respects a sufficient anchor light. The material used in it was equal to the best coal-oil, and it would burn eight hours without trimming. It was easily visible in a dark, clear night, such as this, a mile away; and was kept in place burning brightly from half past 10 o'clock up to and at the moment of the collision.

(4) On December 26, 1889, the Oregon, an iron steam-ship of about 2,000 tons burden, and 300 feet in length, left Portland about 9 o'clock in the evening, for San Francisco, with a cargo of freight and passengers, under charge of a pilot, and drawing between 16 and 17 feet of water, with a proper mast light and side lights burning. The night was dark and clear, the weather calm, with some clouds in the sky. A few stars were visible. According to the calendar the moon set at 9:42 that evening. Besides the pilot, who was on the center of the bridge just abaft and above the pilot-house, there was a man at the wheel, and another forward on the forecastle head acting as a lookout. The steersman and lookout came on duty at 12 o'clock, and besides these no person connected with the vessel was on duty on deck from that time to the collision.

(5) Near 1 o'clock, and a mile or more above Goble's point, and opposite the railway ferry landing, the anchor light of the C. M. and Coffin Rock light might have been seen from the ship's channel in the Columbia river; and there the pilot saw one light, which he took for the latter. From this point the Oregon followed the bend of the river to the westward for nearly a half mile, until both lights were shut out by Goble's point. In the course of the next half a mile she came back to the northward, so that by the time she was abreast of the foot of Sand island, and just above Goble's point, if she had been in mid-channel, both lights would have been plainly visible from her deck, though somewhat nearly in line, the light of the C. M. being the further in shore. But the Oregon hugged the shore in the bend above Goble's point, and came abreast of it on the south side of the channel, when the pilot saw a light which he still

supposed to be Coffin Rock light, and "headed" for it, giving the steersman the course N. W. by N., which he held to the moment of the collision, while the general direction of the ship-channel from there to below Coffin Rock light is N. N. W. At this time the Oregon was going through the water at the rate of 12 miles an hour and about 15 miles past the land, or a mile in 4 minutes. The state of the weather and the condition of the Oregon as to lights, speed, and persons on deck on duty were and continued the same as above stated from thence to the moment of the collision. The light which the pilot saw, both above and and at and below Goble's point, and mistook for the Coffin Rock light, was in fact the C. M. light. He candidly admits that he never saw but one light until after the collision, and when he came around Goble's point he "headed" for it, having it a "little," or about a "quarter" of a point, on his port bow.

But on this point he is somewhat uncertain and obscure. It is clear from the testimony of the steersman, as well as that of the pilot, that the vessel's course was not changed from the time she was headed off Goble's point for the light. If he means that he ran three-fourths of a mile, starting with the C. M. light a quarter of a point on his port bow, without changing his course, he is certainly mistaken; for in that case it is demonstrable that the Oregon would have passed the C. M. not less than 150 feet to the starboard of her. On the other hand, if the pilot means that he held this light throughout the course a quarter of a point on his port bow, then he must have starboarded his helm continuously until the collision, and thus described a parabola, and struck the C. M. at an angle of nearly 45 degrees. On the contrary, the course of the Oregon was not changed, and she ran right into the C. M. in a direction slightly diagonal to her keel, striking her between the port cat-head and the stem.

(6) When a short distance from the C. M., not to exceed 300 feet, the pilot and the lookout on the Oregon simultaneously discovered the C. M. The helm was then immediately put a-port; but it was too late, and the Oregon crushed into the C. M. as stated.

It is difficult to say from the evidence, which is the testimony of the pilot and lookout, how near the Oregon was to the C. M. when the latter was discerned. Neither of them speak with any certainty as to the time that elapsed between that and the collision, and perhaps they ought not to be expected to. The pilot thinks it may have been a minute and a half from the time he started on the last course to the collision. That point was three-fourths of a mile from the C. M. The Oregon was making a quarter of a mile a minute. This would make the distance between the two vessels at the moment of discovery of the C. M. by the Oregon, three-eighths of a mile, or 1,980 feet, more than three and a half lengths of the Oregon. But the pilot is quite positive that the wheel of the Oregon was put over immediately on discovering the C. M., which is very probable, and that the Oregon was just beginning to answer to her helm when the collision occurred. He also says that under the circumstances, she would not "begin" to answer to her helm until she had moved nearly or about twice her length.

This, in my judgment, is a very improbable statement. The Oregon was going through the water at not less than 12 miles an hour, with not less than 12 feet of water under her. There was neither wind nor current to impede her motion, and she must have "begun" to answer to her helm as soon as her wheel was put over. From these facts the conclusion is reasonable that the Oregon was about her length, or less, from the C. M. when the latter was first seen.

(7) It appears from the Commercial Review, published in this city on November 21, 1890, that during the shipping season, between August 6, 1889, and July 26, 1890, 55 vessels left this port, foreign bound,. with wheat and flour, and 5 with salmon; by far the greater number in any one month leaving in December, and in November next. And this was a much less number than usual, owing to the light crop east of the Cascades, and the fact that 21 vessels were loaded at Tacoma during this season. These 60 vessels, with others, were all towed from Astoria to Portland. Vessels being so towed usually anchor for the night, or a portion of it, in the Columbia river. These facts, which are common knowledge on and about the river, show in a general way that the persons in charge of an ocean steamer going down the Columbia at night ought to be on the lookout for vessels at anchor, so as to avoid collision with them. Indeed, the supreme court has said (Steam-Ship Co. v. Calderwood, 19 How. 246) "that neither rain, nor the darkness of the night, nor the absence of a light from a barge or sailing vessel, nor the fact that the steamer was well manned and furnished, and conducted with caution, will excuse the steamer for coming in collision with the barge or sailing vessel, where the barge or sailing vessel is at anchor, or sailing in a thoroughfare out of the usual track of the sail-vessel."

On these facts, in my judgment, the collision is properly attributable to the misconduct of the Oregon:

(a) She should not have been driven through the water at the rate that she was, on such a night, in a river where she was liable to meet other vessels at anchor in the channel or in motion. (b) She should have had more and better lookouts, at least two instead of one; and they should have been on the bow, scanning the horizon and peering into the darkness as far as possible, instead of walking about the forecastle head. (c) She should have had an officer on deck caring for things generally, and particularly to oversee the lookout. (d) Her pilot was negligent or incompetent in mistaking the anchor light of the C. M. for that of Coffin rock, and in not keeping well out into the channel of the river before rounding Goble's point, so as to bring the latter light plainly in view before giving the steersman the course, and also in standing continuously at the middle of the bridge, over and above the light in the pilot-house, instead of moving back and forth thereon.

The pilot seeks to excuse himself for not seeing but the one light—that of the C. M.—by suggesting that the two lights must have been so near in line with one another and the Oregon that a mast of the C. M. intercepted the rays of the Coffin Rock light. Admitting this to be possible, however improbable under the circumstances, still, if the pilot had moved

back and forth on the bridge, he would have been out of the supposed line, and could have seen, with ordinary powers of vision, the lower light. Besides, if at the distance of three-fourths of a mile from the C. M. the Oregon started on her course down the stream with the light of the former about a quarter of a point on her port bow, she would very soon be out and to the starboard of the supposed line with the mast of the C. M. and Coffin Rock light, and the latter would have come plainly in view.

And it may be admitted that when the pilot was three-fourths of a mile from the light of the C. M., and notwithstanding the difference in the distance, size, and radiating power of the two lights, he might without fault have mistaken it for the Coffin rock, still a mile further away; yet, when he got within a quarter of a mile of the C. M., he should, in my judgment, have become aware of his mistake, and gone to the starboard, as he could easily have done.

But there were other and significant circumstances to be considered in this connection. The Coffin Rock light, which the pilot thought he was heading for, was at least one and three-fourths of a mile from Goble's point, and he ought to have known when he had run a half mile from there, and got within a quarter of a mile of the C. M. light, that it was too near for the Coffin Rock one. Again, the surroundings of the two lights were very different. The ship's light was on or over the water some distance from the shore, which is there comparatively low and receding, while the other is on the face of a comparatively high, wooded promontory. The outline of each shore of the river could be easily distinguished from Goble's point to Coffin rock, particularly from the deck of the Oregon.

With all these means of distinguishing these lights, and considering the local knowledge which a pilot on any water is required and undertakes to have, there was no reasonable excuse for mistaking the ship's light for the Coffin Rock one,—especially when within a quarter of a mile of it,—unless it be a serious defect of vision, or want of local knowledge, either of which amounts to incompetency, for the consequences of which the Oregon is liable.

In *Atlee* v. *Packet Co.*, 21 Wall. 389, 396, Mr. Justice MILLER, speaking for the court, said:

"The pilot of a river * * * is selected for his personal knowledge of the topography through which he steers his vessel. * * * He must be familiar with the appearance of the shore on each side of the river as he goes along. Its banks, towns, its landings, its houses and trees, and its openings between trees, are all landmarks by which he steers his vessel. The compass is of little use to him. He must know where the navigable channel is, in its relation to all these external objects, especially in the night. * * *

"It may be said that this is exacting a very high order of ability in a pilot; but when we consider the value of the lives and property committed to their control, for in this they are absolute masters, the high compensation they receive, and the care which congress has taken to secure by rigid and frequent examinations and renewal of licenses this very class of skill, we do not think we fix the standard too high."

How familiar the pilot of the Oregon was with the lights and topography of the Columbia river at night does not distinctly appear. It does appear, however, that he has been engaged as a steam-boat pilot on the Wallamet and Columbia rivers for many years; but it is not shown that he was ever engaged in piloting on the Columbia river at night. The master of the Oregon testifies that he had only been engaged as pilot on the ocean steamers about two or three months when the collision occurred.

The conclusion having been reached that the collision was primarily the fault of the Oregon, it is next to be considered whether the C. M., by the negligence of those in charge of her, contributed to the result. For the rule is that a vessel about to be run down or injured by the action of another, without any fault on her part, must, nevertheless, do what she reasonably can under the circumstances to prevent the injury. *The Maria Martin*, 12 Wall. 47; *The Continental*, 14 Wall. 359; *The Sunnyside*, 91 U. S. 213.

On the part of the claimant it is contended that the C. M. not only omitted to do what she might and good seamanship required that she should do, but that which by statute she was bound to do; that is, to have exhibited a torch-light on the approach of the Oregon, and thereby warned the pilot of the danger of collision.

On the C. M. there was a watch, an aged negro seaman. He had instructions from the master to keep a good lookout for the ocean steamer that was expected down the river, to ring the bell if it came on thick or foggy, and, if anything happened, to give the mate or himself a call. The light was kept in good condition, the bell was not rung, nor was there any flare-up or torch used, or any material provided therefor.

The watch was examined as a witness on behalf of the libelant before a notary, and subjected to a prolonged and puzzli. cross-examination. His testimony as to what took place at and immediately preceding the collision and what he did thereabout is very incoherent, if not contradictory. In my judgment, the witness is not willfully false; but it is manifest that he was not equal to the emergency, and is unable to give an intelligent and accurate statement of what took place on the occasion.

However, this much is quite certain: He saw the Oregon as she came around Goble's point and headed for the ship's light, which was about three minutes before the collision. He saw the white light at her masthead first, and the hull afterwards, but could not tell, until the latter came in view, that the vessel was headed directly for the C. M. This occurred probably when the Oregon was about one-fourth of a mile away, when he commenced shouting "Ship ahoy!" with all his might, but was not heard or observed on the Oregon, which came straight on at full speed and within a minute her bow was driven into that of the C. M. about thirty feet, where she stuck like a wedge in a cleft. The pilot immediately commenced to back the Oregon, when the master, who had come on deck, ordered him to desist, saying that if the Oregon was withdrawn the C. M. would go down at once, with all on board of her. The people on the C. M. were then transferred in the ship's boats to the Oklahama, and as soon as she could make steam the latter went to the aid of the Oregon, and assisted in pushing the C. M. in shore and down stream

until they both grounded, about a quarter of a mile from the place of the collision. The next morning, at high water, the Oregon floated, and was pulled out of the C. M., when the latter dropped to the bottom, with the bow in shore and the forward part of the main deck out of the water, and five feet of water in her cabin. Coffin Rock light was then visible from her stern.

An attempt was made by the defendant to show that the anchor light on the C. M. was down a short time before the collision. A deserter from the ship was found to testify that he was on deck before the collision, and about five minutes before it happened saw the watchman taking the light up into the fore-rigging, just after trimming it, and observed that it was burning very brightly.

This testimony is contradicted by admitted or well-established facts, and is also improbable.

The master of the C. M., whom I regard as an altogether credible witness, says he was on deck soon after 10 o'clock, when the light, by his direction, was taken down and trimmed, not because it needed it, but to insure a good light until morning. This being so, it is very improbable that the old negro watchman would voluntarily incur the unnecessary labor and trouble of trimming this light again before 1 o'clock, which involved the carrying of a heavy lantern down to the deck and back again. The watchman says he only trimmed the light once that night, and that was when directed to do so by the master. An apprentice, a room-mate of this witness, testifies to facts which convince me that it was much earlier than 1 o'clock when he was on deck, and that, if he saw the watchman with the lantern in his hand at all, it was between 10 and 11 o'clock, when he had trimmed the light as directed by the master. On the whole, I do not credit the statement of this witness, at least as to time.

But, admitting it to be true, it neither excuses the Oregon nor puts the C. M. in fault. In effect, it amounts to this: The light on the C. M. was taken down, trimmed, and rehung five minutes before the collision. It was up when the Oregon was at the railway ferry landing, for the pilot saw it. If down after that, it must have been while the Oregon was in the bend of the river, below said landing, and above Goble's Point, when the light could not have been seen from her deck if it had been up. When the Oregon came in sight the light was in place, and burning brightly.

The pilot of the Oregon candidly admits that he saw the light of the C. M. first as he passed the railway ferry landing; that as he got into the bend of the river below the landing the light was shut out by Goble's Point until he rounded the same, when it came in sight again, and he "headed" for it, supposing all the time that it was the Coffin Rock light.

The watchman on the C. M. was not equal to the emergency. When the Oregon came in sight, and the danger of collision was manifest, instead of simply shouting "Ship ahoy!" he should have rung the bell. True, his orders did not require him to ring the bell unless it became "thick." But that did not prevent him from ringing it on the approach of danger. He was not ordered to hail the Oregon either, but he naturally and properly did so; and he had the same right, and was as much

bound, to ring the bell, or use any other means at hand to attract the attention of the people on the Oregon, as to halloo.

The watchman says he thinks his voice could be heard a mile away. But that is largely conjecture, and no particular facts are given to support it. In my judgment, the bell could have been heard further than his voice, and was much more calculated, under the circumstances, to excite alarm, and put the hearer on his guard. It was expected and intended that the ringing of the bell would give timely notice to a vessel approaching the C. M., in a fog, of her existence and whereabouts; and so it might have done in this case. The shrill clang of a ship's bell rung fast and loud is well calculated to attract attention and excite alarm, and thereby put the hearer on his guard.

The omission to show a flare-up or lighted torch is defended or excused by the libelant on the ground that the ship was not bound by law or usage to have or show such a light.

Section 4233 of the Revised Statutes, (Act April 29, 1864, 13 St. 58,) contains 24 rules for the lighting and sailing of vessels of the "mercantile marine of the United States." Rule 10 provides:

"All vessels, whether steam-vessels or sail-vessels, when at anchor in roadsteads or fairways, shall, between sunset and sunrise, exhibit where it can best be seen, but at a height not exceeding twenty feet above the hull, a white light in a globular lantern of eight inches in diameter, and so constructed as to show a clear, uniform, and unbroken light, visible all around the horizon, and at a distance of at least one mile."

By its terms this section is applicable only to American vessels. Yet throughout this case it has been assumed and admitted that it was incumbent on the C. M., while at anchor, as she was, in the edge of the channel of the Columbia river, to exhibit such a light; and this upon theory, I suppose, that the statute is coincident with what is otherwise known in the civilized world as good seamanship or established usage.

But it is objected that the light was hung too high,—probably 25 feet above the hull of the vessel. But a substantial compliance with this rule is all that can be expected; and neither the statute nor usage should be construed so as to put a vessel in fault when her light happens to be hung something more than 20 feet above her hull; as least when appears, as in this case, that the colliding vessel was not misled thereby.

Section 4234 of the Revised Statutes provides:

"Collectors, or other chief officers of the customs, shall require all sail-vessels to be furnished with proper signal lights, and every such vessel shall, on the approach of any steam-vessel during the night-time, show a lighted torch upon that point or quarter to which such steam-vessel shall be approaching. Every such vessel that shall be navigated without complying with the provisions of this and the preceding section shall be liable to a penalty of $200," etc.

This section is compiled from section 70 of the act of February 28, 1871, (16 St. 459,) passed "to provide for the better security of life on vessels propelled in whole or in part by steam, and for other purposes." Section 1 provides—

"That no license, register, or enrollment shall be granted  *  *  *  by any collector  *  *  *  to any vessel propelled in whole or in part by steam, un-

til he shall have satisfactory evidence that all the provisions of this act have been complied with; and if any such vessel shall be navigated without complying with the terms of this act the owner or owners thereof shall forfeit and pay to the United States the sum of $500 for each offense," etc.

Section 70 of the same provides—

"That it shall be the duty of all collectors * * * to require all sailing vessels to be furnished with proper signal lights, as provided for by the act of April 29, 1864, entitled 'An act fixing certain rules and regulations for preventing collisions on the water;' and every such vessel shall, on the approach of any steamer during the night-time, show a lighted torch upon that point or quarter to which such steamer shall be approaching. And every such vessel that shall be navigated without complying with the terms of the act of April 29, 1864, and the provisions of this section, shall forfeit and pay the sum of $200," etc.

By section 41 of the act all steamers navigating the waters of the United States, except public vessels, and vessels of other countries, are made subject to the provisions of the act.

As has been stated, the act of 1864, providing for signal lights, both in the original and the compilation, (section 4233, Rev. St.,) is limited in its application to American vessels. The act of 1871 (section 41) expressly provides that it shall not be applicable to "vessels of other countries," (*The Hathaway*, 25 Fed. Rep. 926;) and the whole tenor of the act, particularly sections 1 and 70, show plainly that it was not intended to be applied to any other than American vessels,—that is, such vessels as are required to be licensed, enrolled, or registered by the collector of customs. This language could never have been used by congress in legislation intended to include foreign vessels in American waters.

In the transfer of section 70 to the Revised Statutes no such purpose is manifested or suggested. The place or company in which it is found furnishes no evidence of such purpose. The preceding section, (4233,) consisting of 24 rules, made professedly to prevent "collisions on the water," applies only to American vessels. This section (4234) is not technically one of these rules, but it is very properly placed immediately after them, is collated with them, and relates to the same subject,—the preventing of "collisions on water." But what is more significant and controlling, like the section of the act of 1871 from which it was compiled, it is in effect restrained by its terms to such "sail-vessels" as the United States collectors of customs may license, enroll, or register, provided they are furnished with the proper signal lights, as required by the preceding section (4233.)

From these premises it follows, in my judgment, that section 4234 of the Revised Statutes, requiring a sail-vessel to exhibit a torch-light on the approach of a steamer, is not applicable to a foreign vessel in American waters, and therefore was not to the C. M.

There is no doubt that the local or municipal law of the United States applies to British vessels in American waters, unless the contrary appears to have been intended by the legislature, and the rights and liabilities of persons and vessels in case of a collision between such a vessel and another on such waters are to be determined by such law. *The Scotland*, 105 U. S. 29.

In this case, however, the act in question, the torch law, appears by a necessary implication to have been intended for domestic vessels only.

Why this regulation should be so limited is not apparent. To prevent "collision" on American waters, and provide for the "security of life" thereon, it is as necessary that a foreign sail-vessel should exhibit a torch-light on the approach of a steamer as a domestic one. But the question of what the statute ought to be is for congress, and not the courts. The latter must administer it as they find it.

This conclusion renders it unnecessary to consider the point made by the libelant, that section 4234 does not apply to a vessel at anchor, because, as was contended on the argument, such a vessel is not, while so at rest, being "navigated," within the meaning of the section.

In *The Lizzie Henderson*, 20 Fed. Rep. 524, it was held otherwise; and I am inclined to agree with the ruling in that case. In my judgment, a vessel is being "navigated," within the purpose of the statute and the ordinary meaning of the term, whether at anchor or not, while she is engaged in a voyage from one port to another.

The claimant also seeks to put the fault of this collision on the C. M., on the ground that she was improperly anchored in the line of the Coffin Rock light, and the usual course of steamers from off Goble's point thereto. My own judgment and finding is that the vessel was properly anchored, both as to the channel and light, and that the Oregon, if properly and safely navigated, would have passed down at least 400 feet to the starboard of her.

But, if this were otherwise, I do not think the claimant can be heard to complain of it. It is stipulated in this case that the Union Pacific, by proper arrangements with the owner and lessee thereof, is and was operating both the steamer and the tug,—the Oregon and the Oklahama, as well as the Oregon Short Line and the Utah Northern. Through its agent, the master and pilot of the Oklahama, Empkins, the C. M. was anchored as and where she was when the collision occurred. And the same may be said of the hanging of the anchor light. Empkins directed the hanging of it, and told the watchman to "hang it higher." To do so would be to take advantage of its own wrong.

And, lastly, did good seamanship require the C. M. to be prepared with material for a torch-light or flare-up, and exhibit the same on the approach of the Oregon, and thus warn her of the danger of the collision?

The testimony of the local pilots and steam-boat men is uniformly to the effect that they never saw or heard of the exhibition of a torch-light by a sail-vessel on these waters; and they add that they never knew of any occasion for one being so used. But the experience and observation of a person on the Columbia and Wallamet rivers is not sufficient to furnish a standard or criterion of what good seamanship demands or includes in this respect.

The first mention of torch-light that I find in the statutes of the United States is in article 8 of the act of 1864, (13 St. 59,) now rule 11 of section 4233 of the Revised Statutes. It is called therein a "flare-up," and directed to be exhibited on "sailing pilot-vessels * * * every fifteen minutes." In section 70 of the act of 1871, (16 St. 459,) now sec-

tion 4234 of the Revised Statutes, the term used is "a lighted torch," and sail-vessels are required to show it on the approach of a steam-vessel in the night-time.

By article 9 of the act of March 3, 1885, (23 St. 439,) adopting the "Revised International Regulations for Preventing Collisions at Sea," it is provided that "a pilot-vessel, when engaged on her station on pilotage duty," shall "exhibit a flare-up light * * * at short intervals," not exceeding 15 minutes; and in article 11 of the same act (page 440) it is provided that "a ship which is being overtaken by another shall show from her stern to such last-mentioned ship a white light or flare-up light."

It is but reasonable to suppose that the flare-up or torch-light was in use as a convenient and effective means of preventing collisions before the same was made obligatory by statute, and the history of navigation and the reports of collision cases show the fact.

Two of the witnesses for the libelant—one a master mariner for 20 years, and now the agent of Lloyds in this port, and the other an officer in the United States navy, and now inspector of lights in this district— testify on this point. The first says:

"The way I understood my duty as a ship-master was to avoid danger by all possible means, and, therefore, if a ship was to approach me, and I had reason to believe there was a bad lookout kept, then I would make my flare-up and show it."

The latter says:

"A flare-up light, or a torch or blue light, is supposed to be in readiness at any time in case of an emergency. * * . * In bad, thick weather, in case of a vessel lying in the track of steamers, they always keep a flare-up light, ready to burn at a moment's notice, or would on all well-regulated ships."

There is no evidence in the case contrary to this. Besides the weight given to it by the character of the witnesses from whom it comes, it commends itself to my judgment on the ground of its reasonableness. Nothing, it seems to me, would sooner or more certainly apprise a misguided steamer, on a dark night, of the existence of a sail-vessel in her apparent path, and the danger of collision if persevered in, than a flare-up or torch-light suddenly exhibited over her side.

Had the C. M. been provided with such a light, and had it been exhibited on the first approach of the Oregon, or even when she was within a quarter of a mile of the C. M., it is probable that the collision would not have occurred. At least the C. M. would have done what she ought and could to prevent it, and the Oregon would have been left without excuse.

I find, therefore, that the C. M. was in fault (1) in not providing her anchor watch with a torch-light or flare-up, whereby her presence might have been indicated to the approaching steamer; and (2) her anchor watch did not avail himself of the means at hand for this purpose, to-wit, the ship's bell.

The collision was therefore the result of a mutual fault. And, although the fault of the Oregon, comparatively considered, was more gross and inexcusable than that of the C. M., still the damages result-

ing from the collision must be divided between them. *The Catharine* v. *Dickenson*, 17 How. 170; *Max Morris* v. *Curry*, 11 Sup. Ct. Rep. 29, and cases there cited.

The damages claimed on behalf of the C. M. are as follows: Raising ship and anchor, $20,253; repairs made and estimated, $24,226.06; equipments lost, $4,092.70; stores lost, $2,272.72; miscellaneous, $3,-417.07; special expenses, such as boarding crew on shore, $1,087.56; demurrage, $23,625; total, $78,974.11.

The correctness and reasonableness of these charges is not seriously contested, if at all, except that of demurrage and the item of $1,250, in the miscellaneous charges, paid the agent for furnishing bonds in the suits.

I have not the time, and the length of this opinion already will not permit me, to go into details in passing on these items.

The master of the C. M. says that her average net monthly profits were $3,000. This, for four and one-half months, the time she was detained in this port on account of the collision, amounts to $13,500. Add to this the difference between the value of the charter lost by the collision and that of the one under which she sailed with 2,500 tons of wheat, which is $4,219, and we have, in my judgment, the demurrage to which the libelant is entitled,—$17,719. There must also be deducted from this amount the sum of 3 per centum thereof, which belongs to the master as part of his compensation, lost by the collision. This is $531.57, which leaves the amount allowed for demurrage, $17,-187.43.

The ship, exclusive of the anchor, was raised by Capt. Whitelaw, on a bid of $19,900 if he succeeded and nothing if he did not. His was the lowest bid but one, which was for the sum of $8,000, by a person without experience or means to do the work, and apparently without any proper appreciation of the labor and risk involved in the undertaking. The weather was cold, the river was rising, with ice coming down from the mountains. There was no time to be lost getting ready or making experiments if the ship was to be saved. Whitelaw had made wrecking a specialty, had been successful, and had a sufficient plant, including a steamer worth $60,000, ready to go to work at once. He states that he only made $4,000, and in my judgment stood an even chance to lose much more.

On the argument, no specific objection was made to this item, but it was claimed formally that the lower bid of $8,000 should have been accepted. This, I am satisfied, would have been equivalent to abandoning the vessel. The libelant offered to turn the vessel over to the claimant, but the offer was declined. By stipulation it was allowed to inspect the work of raising the ship as it went on, and does not now specify any objection to the manner or cost of it; and the principal officer of the claimant in this port expressed his satisfaction that Capt. Whitelaw had been awarded the contract.

The libelants, in the intervention filed April 1, 1890, by the master, John Simpson, his wife, and the crew, for damages for the loss of their personal effects, have testified to and been cross-examined as to their

quantity, kind, and value. No evidence has been produced to the contrary, and their statements are probable and reasonable under the circumstances. It is to be remembered that they left England not many months before on a long voyage through many latitudes, and would probably be provided with a good stock of winter and summer clothing. By the collision the forecastle was cut open, and their effects lost and destroyed. Besides those which could be enumerated and valued, it is evident there were many memorials, keepsakes, and trinkets, which could not be valued or compensated for in money; and although a part of these effects may have shown some use, so that they might have been, in the language of the trade, regarded as second-hand, still they were probably worth to the owners all they cost when new, and they ought to be allowed for them accordingly.

I find that the libelant John Simpson suffered damage by loss of instruments and clothes, $400, and 3 per centum on the profits of the ship, $531.57; total, $931.57; Mrs. Simpson, by the loss of her own and child's clothing, $450; and the petty officers and crew, from the loss of "personal effects," as follows: George H. Beaumont, first mate, $1,000; John Farley, second mate, $142; George Ides, third mate, $312.50; Lochlan McKinnon, carpenter, $35; James Douglas, steward, $30; William Simmons, cook, $80; Joseph Knight, boatswain, $289; John Bell, seaman, $177.50; Alex Fortune, seaman, $60; Charles Letlow, seaman, $55.10; James Travers, seaman, $70; James Woods, seaman, $100; Elijah Roberts, seaman, $65; James Sample, seaman, $92; Edgar Matthieu, seaman, $106.25; Joseph Horton, seaman, $109.50; total, $4,105.42.

The claimant objects to the payment of these claims in this suit, on the ground that the right of the libelants to intervene herein ceased with the delivery of the Oregon by the marshal to the claimant on the stipulation to abide and perform the decree of the court. The same objection is made in the case of the intervention of the administrator of the estates of Austin and Reed and of James Joseph.

There is no question but this is a suit *in rem*, and that the libelants have a lien on the vessel for their several claims, and might have intervened in this suit for their interest therein before the release of the same. Does the discharge of the vessel on a stipulation change the character of the suit? Is it no longer a suit *in rem?* and, if so, why? In a suit *in rem*, according to the course of the admiralty, the vessel, when arrested, could only be discharged by order of the court on a stipulation for its appraised value; and this stipulation took the place in the suit of the vessel, and the stipulations therein were liable accordingly.

This stipulation was taken by the marshal under section 941 of the Revised Statutes, which provides that when "process *in rem* is issued in a cause of admiralty jurisdiction," the marshal shall "discharge the property arrested  *  *  *  on receiving from the claimant" thereof "a bond or stipulation in double the amount claimed by the libelant;" and judgment against the stipulators may be given "at the time of rendering the decree in the original cause."

This statute was passed, as is well known, to° facilitate the convenient and speedy discharge of a vessel from arrest in admiralty; and there is no reason why a discharge of the Oregon under it should be held to have the effect to convert this suit *in rem*, to which all the world are considered parties, and have been warned by the process of this court to intervene for their interest therein, into a proceeding *in personam*, to which no one is or can become a party except the original libelant and the parties in the stipulation.

If the court cannot acquire jurisdiction of the libel of an intervenor unless on the rearrest of the vessel, on process thereon, the proceeding is in no wise different from an original suit, and the economy and convenience of the proceeding by intervention is practically lost.

In this case the original suit was brought for the value of the vessel, as the C. M. was then supposed to be a total loss, and the stipulation on the discharge of the Oregon was given for double the alleged value, $260,000. This amount is more than sufficient to satisfy all the claims against the Oregon involved in this suit. I see no reason why this statute stipulation should not stand for the *res*, as far as it goes, like the admiralty stipulation for the value thereof. Admiralty rule 34 makes no such distinction, but recognizes the right of any person having an interest in the vessel proceeded against—that is, having at least a lien thereon —to intervene for such interest, without reference to the fact of whether she has been discharged from arrest or not. Authorities have been cited by counsel for the claimant to the contrary of this, but in my judgment they are not in point—do not bear upon the question. As, for instance, that the owner of a vessel discharged on a statute stipulation in double the amount of the libelant's claim takes her subject to all other existing liens. This is true, of course, provided such a lienholder does not elect to intervene in the original suit, and make his claim out of the stipulation instead of the vessel.

The claim of the libelant in the original suit and those of these libelants arise out of the same facts, and it is convenient and proper that they should be disposed of in the one suit.

The claim made by Mr. Laidlaw, as administrator of the estates of the deceased seamen Austin and Reed, is objected to on the ground that the admiralty has no jurisdiction in such a case. In support of this objection counsel cites and relies on the cases of *The Harrisburg*, 119 U. S. 199, 7 Sup. Ct. Rep. 140, and *The Alaska*, 130 U. S. 201, 9 Sup. Ct. Rep. 461. What was decided in the first of these cases and affirmed in the second one is succinctly stated by Mr. Justice BLATCHFORD in the latter:

"In the absence of an act of congress or of a statute of a state giving a right of action therefor, a suit in admiralty could not be maintained in the courts of the United States to recover damages for the death of a human being on the high seas or on waters navigable from the sea, which was caused by negligence."

By a strong implication this is an admission that where either of such statutes does exist, such suit may be maintained. And in *Ex parte Mc-*

*Niel*, 13 Wall. 236, and *Railway Company* v. *Whitton*, Id. 270, the court had in effect already so decided. In the former case Mr. Justice SWAYNE said:

"A state law may give a substantial right of such character that where there is no impediment arising from the residence of the parties the right may be enforced in the proper federal tribunal, whether it be in a court of equity, of admiralty, or of common law."

In the latter case, which was an action for damages for the death of a person, upon a statute of the state, Mr. Justice FIELD said:

"In all cases where a general right is thus conferred it can be enforced in any federal court within the state having jurisdiction of the parties."

The statutes of Oregon provide for this case fully and without doubt. Section 371 (Comp. 1887) declares:

"When the death of a person is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action at law therefor against the latter, if the former might have maintained an action, had he lived, against the latter, for an injury done by the same act or omission."

The damages must not exceed $5,000, and the amount recovered is assets in the hands of the administrator.

It is admitted that the right of action conferred by this section on the representative of the deceased is not accompanied by any privilege or lien on the offending thing, if any, and, therefore, although it may, as in this case, arise out of a marine tort, it can only be asserted in admiralty *in personam*. But the statute also gives this privilege or lien. Section 3690 (Comp. 1887) provides:

"Every boat or vessel used in navigating the waters of this state * * * shall be liable and subject to a lien * * * for all * * * damages or injuries done to persons or property by such boat or vessel."

The Oregon was being used to navigate the waters of this state, and the injury complained of was suffered thereon, and she is clearly within the purview of the statute. A state may give a lien for building a ship, (*Edwards* v. *Elliott*, 21 Wall. 532,) or for materials furnished in the home port, (*The Lottawanna*, Id. 558,) and such liens may be enforced in admiralty.

It appears that Mr. Laidlaw has been duly appointed administrator of the estate of each of the decedents by the county court of the proper county, and is therefore entitled to recover in this suit whatever loss the estates of these parties have suffered by their death.

Charles Austin, at the time of his death, was about 25 years of age, and in good condition physically and mentally. Matthew Reed was about 70 years, and in the same condition. The expectation of life, according to the testimony of an expert, for the former was 42 years, and for the latter 8 years. They appear to have been earning $15 a month and found. This, if constantly employed, would amount to $180 a year. But it is not probable that either of them would be so employed

during these periods. Deductions must also be made for the cost of clothing and the usual expenses on shore. The damages in this class of cases are for the pecuniary injury only, and nothing is allowed as a *solatium* or solace for wounded feelings or mental sufferings. *Holmes* v. *Railway Co.*, 6 Sawy. 293, 5 Fed. Rep. 75, 523.

In my judgment, the loss to the estates of the deceased does not exceed $100 a year each. The present value, at 8 per centum discount, the legal rate of interest here, of an annuity of $100 a year for 8 years, is $574, and the same for 42 years is $1,200. I therefore find that the libelant is entitled to recover these sums in this suit.

The claim of the libelant James Joseph is not otherwise specially objected to. At the time of the collision he was asleep in his bunk on the port side of the forecastle, just above Austin and Reed, who were killed. He was caught, in the jam, about his hips and body, and held there until pulled out by the men on deck, which was immediately after the collision. He was in the hospital at Astoria two months. On the 16th of March he was examined by a physician, who testified that he limped on his right leg, that the hip joint was still sensitive, and the muscles rigid. He thinks it doubtful if he will ever wholly recover. So far as known, no bones were broken, nor parts ruptured. His hospital expenses, paid by the vice-consul, amounted to $88. I find that he is entitled to recover $1,500 damages.

The libelant and claimant have stipulated that the cost of repairs on the Oregon on account of injuries sustained by the collision is $8,187.20, and that the time consumed in making such repairs, during which the the steamer was laid up, is 32 days, for which I allow the claimant damages at the rate of $200 a day, or $6,400, making in all the sum of $14,587.20.

On all these sums interest will be allowed for one year, at the rate of 8 per centum per annum, and in each of the three cases of the libelants intervening for their interests, in addition to the damages already found, there is allowed $150 as a compensation for counsel in maintaining these suits.

The total damage arising from the collision as now found is $102,-513.49, sustained as follows:

| | |
|---|---:|
| By the C. M., - - - - - - - | $ 72,536 54 |
| By the master and crew, - - - - - | 4,105 42 |
| By the estate of Austin, - - - - - - | 1,200 00 |
| By the estate of Reed, - - - - - | 574 00 |
| By James Joseph, - - - - - - | 1,500 00 |
| By the Oregon, - - - - - - | 14,587 20 |
| | |
| Total, - - - - - - | $ 94,503 16 |
| Interest on this sum, - - - - - - | 7,560 33 |
| | |
| Total, - - - - - - | $102,063 49 |
| Add to this counsel fee for the intervenors, - - | 450 00 |
| | |
| Total, - - - - - - | $102,513 49 |

Where both vessels are found in fault, as in this case, the rule for apportioning the damages is this: Each vessel is liable for one-half the damage suffered by the other. Where the losses are even, the one offsets the other, but where they are uneven, the half of the difference between the losses is the sum which the one sustaining the lesser loss must pay to the one sustaining the greater. *The Sapphire*, 18 Wall. 56; *The North Star*, 106 U. S. 18, 1 Sup. Ct. Rep. 41.

The difference between the loss sustained by the C. M. and the Oregon is $57,949.34, and the one-half of this sum,—$28,974.67,—with interest amounting to $31,292.64, must be paid by the Oregon to the C. M., to equalize the loss arising from their mutual fault.

Both vessels having been found in fault, they are equally liable to the intervenors for the whole amount due them,—$8,419.85. Both vessels being before the court, this sum will be divided between them. The one-half of it,—$4,209.93,—will be added to the decree against the Oregon, and the other will be paid out of the money made on such decree for the C. M.

No claim is made on behalf of the C. M. that she is not liable, if in fault, for the one-half of the damages sustained by the intervenors. The fault of the C. M. in not being provided with a torch-light on the night of the collision was not the fault of a fellow-servant of the intervenors, but that of her owers, or their *alter ego*, the master; and as to the latter, the matter is left between him and his employers. *The Queen*, 40 Fed. Rep. 694.

A decree will be entered against the Oregon for the sum of $35,502.57, —together with one-half of the costs of the case, to be taxed; and unless the same is paid within 30 days therefrom an execution may issue therefor against the property of the stipulators.