## THE OREGON.

(District Court, D. Oregon.    July 15, 1898.)

### No. 2,486.

1. EVIDENCE—TESTIMONY ON FORMER TRIAL—CHANGE OF PARTIES.
    After a vessel libeled for collision had been released on stipulation, intervening libels were filed, on which a trial was had, and a judgment rendered for interveners, which was reversed on appeal, on the ground that the liability of the claimant on the stipulation could not be increased by the subsequent filing of new claims, and that, as the vessel had been discharged, the court could not adjudicate such claims.    Held, that under such decision, which, in effect, determined that the vessel was not a party to the judgment, after new process had been issued on the intervening petitions, and the vessel again taken into custody, the parties were not the same, so as to render testimony taken on the former trial admissible on a second trial.

2. COLLISION—EVIDENCE OF NEGLIGENCE—INSUFFICIENT WATCH.
    The facts that a steamer was running down the Columbia river from Portland on a dark night, at a speed of 15 miles an hour, over a course where it was the custom for sailing vessels to anchor at night, with only one watch and no officer on deck, are evidence of negligence contributing to a collision with a ship at anchor.

3. SAME—DAMAGES—COMPUTATION OF INTEREST.
    Where intervening petitions claiming damages growing out of a collision were filed after the vessel had been discharged on stipulation, but were subsequently treated as original libels, and process ordered issued thereon, the date of such order will be considered the time of commence-

ment of the suit, for the purpose of computing interest on damages recovered.

4. SAME—RATE OF INTEREST.

In collision cases interest will be allowed on damages recovered at the rate of 6 per cent.

In Admiralty.

Williams, Wood & Linthicum, for libelants.

Cox, Cotton, Teal & Minor, for claimant.

BELLINGER, District Judge. The facts in this case are shortly stated in 73 Fed. 847. It is enough to state in this connection that the steamship Oregon was arrested in December, 1889, on the libel of the master of the ship Clan Mackenzie, for damages resulting from a collision on the Columbia river between the two vessels; that she was released on the stipulation of the Oregon Short Line & Utah Northern Railway Company, as charterers for 99 years, on a stipulation for $260,000; that after such release interventions were filed by the master of the Clan Mackenzie, in his own behalf and that of his wife, and by some 18 of the crew, and by the British consul, as administrator of the estates of two deceased seamen; that a decree was rendered by Judge Deady against the stipulators for the damages awarded the interveners, aggregating some $6,000, in addition to an award of $72,536 in favor of the Clan Mackenzie (45 Fed. 62); and that, this decree having been affirmed in the circuit court, there was an appeal to the supreme court of the United States, where the decree was reversed (158 U. S. 211, 15 Sup. Ct. 804), that court holding that the liability of the claimant on its stipulation could not be increased by the intervention of new claims after the stipulation was filed and the steamship discharged. From this point the history of the case is as follows: The supreme court remanded the case, "without prejudice, however, to the right of the court below, or of the district court, in its discretion, to treat the intervening petitions as independent libels, and to issue process thereon against the steamship Oregon, her owners or charterers, or to take such other proceedings thereon as justice may require." In the exercise of the authority thus reserved to it, this court entered an order permitting the libels of intervention to stand as original libels from the date of their filing, and directing process to issue against the Oregon. The steamship was arrested, and was released upon the claim of the Oregon Railway & Navigation Company, to whom the Short Line Company, having become insolvent, surrendered the property held under its lease from the former company. Thereupon exceptions were filed to the libels of intervention upon the ground that the claims made therein were stale, and barred by laches of the interveners, and, further, as to Laidlaw, that the facts did not entitle him to relief. All these exceptions were overruled, except as to the interventions of Laidlaw. As to these the court was of the opinion that the provision of the state statute giving to the representatives of deceased persons a right of action, by which it is provided that such action shall be commenced within two years after the death, operated as a limitation of the liability as created, and not of the remedy alone, and that the claims represented by Laidlaw were barred

on two grounds: (1) That since the libels of intervention could not operate as independent libels under which process could issue, without an order of this court so permitting, and since the matter of such permission was wholly within the discretion of this court, such intervention could only be effective as the commencement of a suit from the date of the order; that if, without the order, the statute had run, the court could not by such order relieve one party from the bar of the statute nor impair the rights vested under it in the other party; and (2) that, if the order could be given the retroactive effect attempted for it, yet, since the laws of Oregon limit the liability to cases where the action shall be "commenced" within two years, and the same laws provide when an action shall be deemed "commenced," the question as to whether the action was brought within the time must be determined, not with reference to the general admiralty law, but with reference to the particular laws which authorize it. From this ruling Laidlaw appealed to the United States circuit court of appeals. In the meantime the case went to trial upon the libels of the other interveners, and the answers thereto of the Oregon Railway & Navigation Company, claimant. Upon such trial proctor for libelants offered in evidence the depositions of the libelants taken on the former trial, but these were excluded, on the ground that it did not appear that the witnesses were dead or that the testimony could not be had, nor that the two suits are between the same parties or their privies. The hearing was postponed in order to enable libelants' proctor to procure the testimony of his clients, and letters rogatory were directed to issue therefor upon a proper showing made in that behalf. It transpired that only a part of the libelants could be found, and the depositions of these have been taken and are in evidence. The cause, having been submitted, now comes on for final decision. Pending these proceedings the circuit court of appeals reversed the order of this court, sustaining the exceptions to the Laidlaw intervention, and that case or branch of the case is remanded to this court for further proceedings. 26 C. C. A. 665, 81 Fed. 876.

The right to introduce the testimony taken upon the former case is insisted upon in the libelants' behalf. The matter in issue is the same in each case, but the parties are not the same. The Oregon was not proceeded against by the interveners, and neither the steamship nor her owners have ever appeared or been parties in the intervention. Assuming, as the court of appeals has decided, that the filing of the petition of intervention constituted the beginning of a suit against the Oregon, although there was no arrest or attempt at arrest of the steamer, and no intention of proceeding against her, it follows either that the proceeding as to the interveners constitutes a proceeding distinct from that which resulted in the hearing and findings in that suit, or that such hearings and findings are conclusive of the matters in issue upon this hearing, and the entire matter is res adjudicata. And so of the contention that there is privity of relation between the Short-Line Company and the Oregon Railway & Navigation Company. If there was such relation of privity between these parties as to make the evidence in the former case admissible here, inasmuch as the doctrine of privity extends to judgments and decrees, the decree

in the former case is conclusive of all questions involved in this case. But the fact that the decree as to these interveners was reversed in the supreme court upon the ground that the Oregon was not proceeded against—was not a party in that suit—is conclusive against the admission of the evidence in that case on this hearing; in other words, the principle that rejects the decree rejects the evidence upon which the decree was rendered.

The case, upon the facts showing negligence on the part of the steamship, is not materially different from the former case, which may be considered as a precedent, although it is not admissible as evidence. There is additional testimony tending to show that the anchor light on the Clan Mackenzie was lowered and trimmed just before the collision, and this fact is strongly relied upon by the defense to prove negligence on the part of the ship. The collision occurred about 1 o'clock in the morning on December 27, 1889. Capt. Pease, the pilot on the Oregon, explains his failure to see the light on the Clan Mackenzie upon the theory that the light had been lowered some minutes previously, and that it was hoisted again just before the collision. He explains that he had a book containing the courses for the steamship. Immediately before the collision his attention was taken up in picking out from this book the next courses to be followed. In doing this he placed his head in a booby hatch over the hole through which the pilot speaks to the man at the wheel, where his book would be kept dry, and, with the aid of a small light, picked out the course from the foot of Sandy Island to Coffin Rock, and, as he thought he saw another snow squall coming, he picked out the next course from Coffin Rock down. He was thus engaged less than a minute,—a quarter of a minute, a half a minute. What followed is thus described by the pilot:

"When I was looking in that hatch that way, I could not look down and see the compass, and, as I had taken the courses and shut my book, I looked at the compass, and saw where the ship read. I said to the man, 'Steady,'—that was, stop where he was swinging; and as I looked out to the side I saw the lights of Kalama just coming below the island, and I knew I was just in the right place. I asked the man how he was heading then, because when I was standing up I could not see the compass. I said, 'How are you heading?' He told me how he was heading; he was heading exactly on the course to run down clear of Coffin Rock light. I saw then a light right ahead of me, probably a quarter of a mile away,—a little more than that, perhaps, not much, though,—and I made up my mind that it was Coffin Rock light, and I was going in such a shape that it was just about a half a point on the port bow of my ship; and going a half a point off, in going a mile, according to my calculations, we go 500 feet to one side of a straight line. When he said he was on that course, and I saw this light exactly in the direction that Coffin Rock light should be, the way I was heading, and I run on till, perhaps,—well, a minute; and all of a sudden I saw the reflection of a light on the mast of a ship, and I was satisfied then I could not miss, but the first thing I done was to sing out to the man at the wheel to put his helm hard a-port, and rung the stopping bell, and I rung the stopping bell and the backing bell right away, and the next instant we struck the ship, and as we struck the ship we swung a little to one side, and then I saw Coffin Rock light past that ship."

The theory of the defense is that the light on the Clan Mackenzie was hoisted while the pilot was engaged in picking out the ship's courses as described, and that if the light had been displayed there-

tofore, as prudence demanded, it would necessarily have been seen by the steamer, and the accident averted. On the other hand, it is claimed that the light had been trimmed early in the evening, and that it was displayed and plainly discernible at all times to a vessel coming down the river, after opening up Sand Island, except possibly for a short time, when it was shut off by Goble's point. In the former case, according to the statement of facts contained in the opinion of the district court, it was admitted by the pilot of the Oregon that he saw the light on the Clan Mackenzie when opposite the point known as "Ferry Landing," on the Oregon side of the Columbia river, more than two miles above where the ship was anchored, which he mistook for the light at Coffin Rock, a mile below the Clan Mackenzie. But there is no such admission in this case, and such a fact cannot be reconciled with the claim then and now made that the ship's light was lowered and trimmed and replaced immediately before the accident. The steamship was going about 15 miles an hour, with an ebb tide, and it is extremely improbable that the ship's light could have been lowered, trimmed, and replaced in the time occupied by the steamer in going from ferry slip to the point of collision. Moreover, it is one of the difficulties in the defendant's case that the Clan Mackenzie's light should have been raised to the forerigging of the ship, a distance of 20 or 25 feet above the ship's deck, without attracting the attention of the pilot on the Oregon or the man at the wheel or the lookout on duty on the forecastle head. The pilot's explanation that his attention was withdrawn while picking out his courses, at such time as might suffice to replace the ship's light without attracting his attention, does not explain why the man at the wheel and the lookout on the forecastle head, one or both, failed to see this light carried into the forerigging. At this time the Oregon was probably not more than one-fourth of a mile from the ship, and such a light, at such a distance, ascending to the ship's rigging, 20 or 30 feet in height, must necessarily have attracted the attention of the man at the wheel or the lookout. There is nothing improbable in the explanation of the pilot that this light was raised at the time he had his head in the booby hatch picking out his next two courses. Such a coincidence might have happened. But when to this coincidence we are required to add others, of like character, to account for the failure of the man at the wheel and of the lookout to see this ascending light, the probabilities against this theory of the accident seem to preclude belief. Upon the alternative hypothesis of a light on the ship from the time the Oregon opened up Sand Island, it is difficult to understand why one light was seen, and not two. The steamer's course, for a distance of $3\frac{1}{2}$ or 4 miles before reaching the spot where the Clan Mackenzie was anchored, described the reverse of an elongated letter S. The varying courses of the steamer made it impossible for the ship's light to shut out the light at Coffin Rock, at least for an appreciable length of time. If there was any question as to the existence of an anchor light on the ship at the time of the collision, it would afford a means of escape from the difficulty of explaining why the pilot, the man at the wheel, and the lookout on the forecastle head saw but a single light. I hesitate in adopting either of these theories. Nevertheless, since

one of them is necessarily true, I conclude that it is more probable that the light was displayed on the ship as claimed by the libelants, than that it was carried into the forerigging when the two vessels were about one-fourth of a mile apart, and was not seen from the Oregon at the time, nor afterwards seen or distinguished from the Coffin Rock light, until the steamer was within 300 feet of the ship.

The deficiencies in the watch on the steamer, in view of its high rate of speed, the darkness of the night, and the practice that existed for sailing vessels to anchor in the river at night, are held in the first case to be evidence of negligence; and upon that authority, if the question was doubtful, these deficiencies must be held in this case to be evidence of negligence contributing to the accident.

The testimony as to the damages suffered by libelants in loss of clothing and other property is, with few exceptions, indefinite and unsatisfactory. The loss of Simpson and wife is testified to by John Sample, a seaman, neither of the persons interested having testified. Sample testifies that he knows that Capt. Simpson had a musical instrument of some kind, navigation instruments, slop chests, charts, books, and other valuables. The witness says: "And the total amount I should judge to be worth about four hundred dollars." The witness does not pretend to have definite knowledge concerning these losses, and his estimate may be based upon the testimony in the other case or the findings of the court therein. He does not pretend to know the kind of musical and navigation instruments owned by Capt. Simpson, or what the other valuables were, or the contents or value of the slop chest, and yet the fact is undisputed that specific articles of property, having more than a nominal value, were lost, and I am constrained to find for the libelant Simpson in the sum at which the witness Sample places his loss. All that the witness testifies to as to Mrs. Simpson's loss is that she had "considerable fine clothing and a child." "This," he says, "is pretty hard to value, but I should judge it to be worth at least $400 to $500." I cannot go so far as to base a finding of loss in any sum upon such testimony. While the witness may have had, and probably did have, means of knowledge, more or less definite, concerning the captain's musical instrument, his books and charts, the slop chest and its contents, from which his own supplies were furnished, it is not likely that this sailor knew anything about the wardrobe of the captain's wife and child. He would not be likely to know whether she had considerable or what amount of fine clothing. A member of the crew may guess that the captain's wife has "considerable fine clothing," and that, I infer, is all that this witness attempts. I am convinced that the statement of the witness that he should judge the value of Mrs. Simpson's wardrobe to be from $400 to $500 is based upon the testimony in the other case. He does not pretend to have, and in the nature of things cannot have, any information in the premises. I find that several libelants have suffered loss in property and effects as follows: John Simpson, $400; George Ides, $290; John Bell, $177; John Farley, $135; Lochlan McKinnon, $40; James Douglas, $24; William Simmons, $65; Joseph Knight, $100; Alex Fortune, $58; Charles Letlow, $53; James Wood, $91; Elijah Roberts, $65; James Sample, $87; Edgar Matthieu, $91;

James Ferguson, $72; James Horton, $48; Stephen Panting, $101; J. Travers, $70. James Joseph was injured in the collision. He was confined in the hospital some two months, and claims to have lost some time since on account of impairment of strength due to his injuries. He is able to earn within five shillings per month of the wages regularly paid to men of his class. This loss in his earning capacity he says is due to the fact that he is a little slower than formerly, on account of rheumatism. This rheumatism he attributes to the injuries received in the collision. But this is a common complaint, and there is nothing in the case to warrant the conclusion that it is due in this libelant's case to the accident in question. Including hospital expenses and loss of effects, I find that he is entitled to $700. I find for the estate of Austin $1,200, and for that of Reed $574. Interest upon these sums will be allowed from the date of the order allowing the libels of intervention to be treated as independent libels. For the purpose of fixing the amount of interest to be allowed, such date is regarded as the commencement of proceedings against the Oregon. The rate allowed is 6 per cent., in obedience to the rule adopted by Judge Blatchford in The Aleppo, 7 Ben. 120, Fed. Cas. No. 158, following the opinion in Hemmenway v. Fisher, 20 How. 258. In the case of The Aleppo, Judge Blatchford said that, "where interest is allowed, it ought to be a uniform rate, and not one varying with the laws of the states"; that such rate of interest in collision cases tried in that court had been 6 per cent.; that this rate was fixed at an early date, in analogy, perhaps, to the rate fixed by congress as the rate on bonds for duties to the United States; and that it is the rate which the supreme court has allowed in cases of this kind. A decree will be entered against the Oregon in accordance with these findings and decision.