## QUINETTE v. BISSO et al.

### (Circuit Court of Appeals, Fifth Circuit. April 10, 1905.)

#### No. 1,273.

1. COLLISION—STEAM VESSEL IN FOG—"MODERATE SPEED."

"Moderate speed," required of a steam vessel in a fog, is purely a relative term; and what constitutes such speed in a given case is to be determined with reference to the time, place, and circumstances, rather than from the actual speed.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 170–175.

Collision rules—Speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.]

2. SAME—CARE REQUIRED WITH RESPECT TO SMALL CRAFT.

The right of a steamer to maintain her course or speed, even against small craft like a skiff or yawl, is relative, and not absolute. She has no right to maintain a speed which is dangerous to a smaller craft which can be seen ahead, and, where she is navigating in a fog so dense that such a craft cannot be seen at any considerable distance, and in a locality where numbers of them are liable to be encountered, she is required to exercise extraordinary care and watchfulness, and is not justified in relying solely on fog signals as a warning to other vessels.

3. SAME.

Where a tug was going up the Mississippi river in the early morning near the shore at Nine-Mile Point, above New Orleans, at a time and place where people were likely to be crossing the river in small boats, and in a fog so dense along the water as to render it impossible to see such boats more than a few feet, a speed of 7½ to 9 miles an hour was immoderate, and gave a right of action against the owners, under the Louisiana statute, to recover for the death of a person who was run down by the tug while crossing in a skiff.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 213–215.]

4. ADMIRALTY—ACTION FOR WRONGFUL DEATH—ENFORCEMENT OF REMEDY GIVEN BY STATE STATUTE.

An action in admiralty for wrongful death, based on Civ. Code La. art. 2315, is governed by the local law, with respect to the defense of contributory negligence.

5. COLLISION—SKIFF—FAILURE TO USE FOG HORN.

The noise made by the use of patent rowlocks on a skiff is not equivalent to the fog horn required by the navigation rules.

6. CONTRIBUTORY NEGLIGENCE—PASSENGER IN SKIFF—IMPROPER NAVIGATION.

A person who entered a skiff owned and rowed by others, to be taken across the river at New Orleans during a fog, and who was run down by a passing tug and drowned, was not chargeable with contributory negligence because the skiff was not equipped with a fog horn, where that was not customary, nor because of any error on the part of the oarsman, who was skilled and accustomed to make the passage, and had full charge of the boat; nor was her act in so doing a proximate, contributing cause of her death, resulting primarily from the immoderate and unlawful speed of the tug.

7. FEDERAL COURTS—FOLLOWING STATE DECISIONS—ENFORCING STATUTORY REMEDY.

A federal court, in administering a state statute giving a right of recovery for wrongful death, will follow the decisions of the highest court of the state with respect to the measure of damages.

[Ed. Note.—State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

Appeal from the District Court of the United States for the Eastern District of Louisiana.

This is an appeal from the decree of the District Court dismissing the libel exhibited by Malvina L. Quinette, a feme sole, against Joseph Bisso and Joseph A. Bisso, owners of the steam tug Leo (Joseph A. Bisso being master) for running down a skiff, in which libelant's daughter Sophie L. Quinette and a negro oarsman were attempting to cross the Mississippi river, in consequence of which Miss Quinette was drowned, on the morning of the 5th of November, 1900, at Nine-Mile Point, above New Orleans.

The libel charged that the Leo failed to give fog signals, got out of her proper course, maintained an immoderate rate of speed, failed to keep a proper lookout, and did not use proper efforts to rescue Miss Quinette after she was thrown in the water. It alleged "that Robert Bolds, the oarsman, gave signals by calling out in a loud voice, sufficient to be heard by those in charge of the Leo, and, further, that the noise made by the patent rowlocks with which the skiff was equipped was equivalent to the signal required to be given by skiffs in a fog, and a due compliance with the laws of the United States," and that the death of Miss Quinette "was due wholly and solely to the incompetency, unskillfulness, wanton negligence, and gross, criminal negligence of those in charge of the Leo, and by reason of the violation of navigation laws of the United States." The answer denied generally and specifically all the faults charged, and that the noise made by the rowlocks was an equivalent for the signal required by the statute and rules, and, further, insisted that Miss Quinette's "death was caused by her own fault, as well as the fault of said Robert Bolds, in that said skiff was navigated in a dense fog without observing due care and caution, in failing to give fog signals, although in the track of vessels, crossing the course of approaching vessels, and in not keeping out of the way of an approaching steamer, and in failing to give any signal or warning of their location and proximity to the tug." The case was heard upon the depositions of some 50 witnesses, taken down stenographically before a commissioner. The witnesses were examined at great length, and the record contains 330 pages of printed testimony. It is impossible, without unduly swelling the statement of facts, to notice in detail the testimony of the different witnesses. It suffices to say that the record, in substance, presents the following state of facts:

Miss Quinette at the time of her death was not quite 22 years of age. She lived with her mother at Nine-Mile Point, and had two brothers, James and Frank, and a sister, who also resided there. For three or four months prior to the time of her death she had been going from Nine-Mile Point to New Orleans, where she had been studying to perfect herself as a milliner. She was then paying her own board, and had just begun to receive $12 a month from her employer. In that time her brothers had given her $60. Her mother testified "that she had made as much progress in four months as some others had in two years and a half," and stated that, "had she lived, she had a prospect of receiving sixty dollars a month," which statement libelant made "because others were getting that, who were not as efficient as she." This was all the testimony on that point. Bolds, the negro oarsman, was then 21 years of age, but had lost an eye by an accident in his youth. He was shown to be a good oarsman, having had 8 years' experience on the river. On the morning of the accident, James Quinette, who was the owner of the skiff, told Bolds, who was in his employ, "to get the boat ready to take his sister over the river," and shortly afterwards she and the oarsman got in the skiff and started on their journey. It was then a few minutes before 7 o'clock. The skiff was 20 feet long, the sides of cypress plank, 2 inches thick, according to the testimony of its owner, and was substantially built, and propelled by oars. "It was an extra long skiff, more like a yawl." Miss Quinette took her seat in the stern of the vessel, and the oarsman sat near the front end, pulling the oars at the front oarlocks. They boarded the skiff while fog hung low on the river just above the raft of logs, about five or six hundred feet long and one hundred and twenty feet in width, which was moored to the bank, near, if not at, the very apex of the bend at Nine-Mile Point. As the raft lay partly aground, only about half of it rested in the water.

The part which was in the water jutted out nearly at right angles from the shore, a distance of about 60 feet, into the river. The skiff was afterwards found, deposited on the top of the logs, on the edge of this projecting side of the raft, not over 35 feet from the shore. Photograph marked "P1" shows the situation.

Bolds testified that after getting in the skiff he "pulled out about middle-ways of the raft," and was headed down the river to Protection Levee, on the opposite bank, and "never heard any noise of the tug or whistle blowed at all; and so, in pulling, all of a sudden she said, 'Robert, look at that tug,' when I looked around and the tug was. coming right on me. I pulled and hollered all I knew how, and jumped up and tried to check her headway, but she just run into us and upsetted us." Bisso made the following report of the accident:

"New Orleans, Nov. 5th, 1900.

"Messrs. Kelly and Youngblood, Local Inspectors, New Orleans, La.—Sirs: I herewith respectfully report that while ascending the Mississippi river, on the tug Leo, at about 7 a. m., during a dense fog on the river, yet the tops of the trees were visible, and running under a slow bell, I sighted a skiff some fifteen or twenty feet in front of the tug. I immediately stopped and backed the boat at full speed astern. The skiff contained two persons, a young lady and a one-eyed negro, who was rowing the skiff. The tug came in collision with the skiff, shattering it, thereby throwing the occupants into the water. The mate of the tug jumped overboard to ' assist in the rescue of the parties, and at the same time a boat was lowered, but unfortunately the negro alone was saved. I have since learned that the name of the unfortunate lady who was lost was Miss Sophie Quinette. All possible means were used to preserve life. The tug at that time was about 150 feet from the right bank, just above Nine-Mile Point.

"Yours truly, Joseph A. Bisso, Master."

The Leo left her landing in New Orleans, at the foot of Walnut street, nine miles from Nine-Mile Point, early that morning, to go to Twelve-Mile Point for a tow. After reaching the ferry landing, she quartered across the river until near Westwego, on the opposite bank, and then went up on that side towards Nine-Mile Point. The Leo is an ocean-going, iron-hull, steam tug, 83 feet in length, 19 feet in beam, and 7 feet draught. She had one compound condensing engine, of 16 and 28 inches diameter of cylinder, and 20" stroke of piston, and one boiler, 14 feet in length and 117 inches in diameter, and was allowed a steam pressure of 127 pounds to the square inch. The record does not show her horse power. All the evidence shows, however, as her master states, that the Leo was "a powerful boat"; an "ocean-going, steam, iron tug." Her propeller sat rather low in the water, and, being driven by a low-pressure engine, she made less noise when in motion than high-pressure boats. She ordinarily carried 90 pounds steam pressure. Her pressure that day was from 90 to 95 pounds. Her ordinary speed was from four to five miles an hour, but she could make twelve miles an hour. The testimony of the witnesses is quite conflicting as to her speed that day. Her master swears that her speed was between three and four miles an hour. Her engineer testifies that it could not have been more than four or five miles an hour. Some of the crew testified she was not going "over three to three and a half miles an hour." Other witnesses, who are not shown to be interested in any way, say the "Leo was not going over four miles an hour at the outside." Other witnesses, more numerous, and most of them disinterested, testify that "the Leo was going at a · pretty fair rate of speed"; that "she was going pretty fast." Some of them fixed the speed at "seven or eight miles an hour"; and others, "eight or nine miles an hour." The witnesses as to the giving of fog signals are generally the same witnesses who testified as to speed, some affirming and others denying that fog signals were blown. In the view the court took of the matter, it is unnecessary to detail the testimony on that point.

During the voyage of the Leo a low-lying fog hung over the river, and there was no breeze. The fog was quite thick, and rose 8 or 10 feet above the water. It was densest at the water, and gradually grew thinner upwards. "At times it would raise, and at times lower. Sometimes a little gush of it would come

up, and then it would lower." The lookout stationed at the stem of the bow, which stood about 10 feet above the water, could not see objects ahead in the fog, like small water craft, which sat low in the water. Persons standing in her pilot house were from 20 to 25 feet above the water, but could not see an object like a skiff in the water more than 25 or 30 feet ahead, although the tops of the trees on either bank were visible from the pilot house. As the Leo was nearing the point of Nine-Mile Point bend, Capt. Bisso discovered ahead, not over 25 or 30 feet distant, a skiff in which Miss Quinette and the negro oarsman were seated. The captain immediately gave the signal to back the tug astern at full speed, which order was at once obeyed, and shouted that some one was overboard, and ordered the lifeboat lowered, but did not change her course. Miss Quinette at the time was sitting in the stern of the skiff, and the oarsman, near the front end, using the front oarlocks. It is not clear from the testimony whether both the occupants of the skiff fell on the same side of the tug as she passed on. The Leo continued to go forward until she struck the raft, carrying the skiff forward with her, and landing it upon the raft. Some of the witnesses say, "The skiff was hanging on the bow of the tug;" others, that "she went in with the tug"; and others, "that the skiff rested on the bow of the tug." The contact of the tug with the raft broke two heavy wooden binders, eight inches in diameter, by which the logs were fastened by means of wooden pins driven through the binders into the logs, broke the wooden pins by which two inside binders were fastened to the logs, snapping in two parts of the first set of binders—the broken parts floating in the water—and mashed or jammed two or three of the logs of the raft. Yaeger, who was watching timber at the point near Quinette's house, testified that when the accident happened he was inside, eating his breakfast, when he heard the crash of the timber, and he went at once down to the lower end of the raft. Another witness (White) testified that while taking his breakfast in a boathouse, which was near the middle of the raft—the boathouse being about 45 feet out in the river—his wife heard a crash, and they all went out to see about it. Mrs. Frank Quinette, sister-in-law of the deceased, testified, she was standing in her yard, some distance from the house, and "heard hollering, which she thought was at the Southport; that she listened a few minutes, and did not hear any more hollering, and then heard a crash, which she thought to be over at Southport," on the opposite bank. Listening a few minutes thereafter, but hearing nothing more, she went into the house, and remained there until notified of the accident. Several of the witnesses thus attracted to the scene testified that on going to the raft, which they reached very soon after hearing the noise of the crash, the Leo was not then in sight, but that they saw the skiff, which was resting on the raft, in the position hereafter stated, and that the raft was wet, and the skiff on the outside was wet, and probably on the inside. While on the raft they heard noises, which were apparently continued at one place for eight or ten minutes, "like men giving orders," and talking out in the river, at a considerable distance from the bank. They remained on the raft until they found the Leo had landed at another portion of the raft. According to the testimony, the negro oarsman "was swimming and hollering out there" for some time, and the tug, whose engines were working full speed astern, backed out in the stream immediately after contact with the raft; and this oarsman was taken aboard by a life line thrown to him, by which he was drawn over the stern of the tug, but upon which side is not clearly shown. Miss Quinette, who could not swim, was drowned, despite the brave efforts of Benjamin F. Stewart, the acting mate, who jumped into the river and swam to her assistance, and held her above the water for some time; the fog, as he states, having lifted a little about that time. The oarsman testified that he did not see Miss Quinette in the water until he got upon the tug. Stewart could not give any accurate judgment of the time he was struggling in the water with Miss Quinette, but thought it was "about fifteen minutes," and other witnesses put the time at less. Stewart did not know whether the tug was standing still, going ahead, or backing while he was in the water. He became exhausted, and a life line was thrown to him. He did not have hold of Miss Quinette at that time, and his judgment was that they were not within reach of the life line when he was struggling with her.

At the time the skiff was run down, the tug. and doubtless the skiff, had lost their bearings in the fog. The oarsman had no compass, and, according to his own statement, he judged the direction he took by the way he was guiding the skiff. The Leo had been feeling her way at times, and locating her position by the echo of her whistle, and sighting the tops of the trees on the banks. Bisso could not tell at the time he struck the skiff how close he was to the bank—whether it was 25 or 150 feet away. The skiff was struck on the port bow, not far from the stem, and that side of the skiff was ripped and broken towards the stern, which was not injured. The bottom of the skiff and its starboard side were not broken, and, when found on the raft, it was resting right side up, near the edge of the raft, very slightly quartering, near by and almost parallel with the direction the binders were pinned on the side of the raft. Photograph P5. From the evidence it is not clear at what point the skiff was sighted, or how far that point was from the raft. It may have been a hundred yards or more down the river, not far from the shore, below the raft.

It is a conceded fact that the lifeboat was not lowered. Capt. Bisso explained that the statement in his report as to it was a mistake due to the excitement incident to the accident, and the fact that he had been arrested, but that he believed the statement when made, because he ordered the lifeboat lowered. Several of the witnesses, however, testified that when the tug was landed, after rescuing Bolds, Bisso's attention was pointedly called to the fact that the lifeboat was neither lowered, nor the canvas cover taken off. Stewart jumped overboard before the tug struck the raft. The rest of the crew testified that they felt no shock and heard no noise from the contact.

Opposite Nine-Mile Point, on the other shore, about three-quarters of a mile distant, is Southport, where there are railroad terminals, steamship wharves, grain elevators, and like enterprises. The river is constantly used by steam vessels and smaller water craft, and for floating and towing rafts, and by persons crossing from one bank of the river to the other in skiffs and flatboats, in all seasons and conditions of the weather. New Orleans was the home port of the Leo, and Bisso, her master and pilot, was familiar with the locality at Nine-Mile Point, and knew the dangers attending navigation there. In running her course from Westwego Ferry Landing to the point where the collision occurred with the skiff, the Leo traversed a distance of from 2½ to 3 miles, and had not left the Ferry Landing, according to the great preponderance of the testimony, more than 20 minutes that morning before she ran down the skiff. The time of the accident is clearly about 7 o'clock in the morning. Bisso fixes it at 7. Mrs. Quinette, who testified to hearing the crash at the raft, stated that after hearing of the accident she looked at the clock, and it was then 10 minutes past 7.

The court below, in dismissing the libel, intimated that perhaps the deceased was guilty of contributory negligence in undertaking the voyage under the circumstances, with no means of signaling, no compass, and under the sole guidance of a young, one-eyed oarsman, and held that the contention that the noise made by the patent oarlocks was equivalent to the required signal was clearly untenable. It decreed upon the merits, however, upon the assumption that the skiff was under no obligation to provide itself with any means to indicate its presence in the fog, and that the occupants were guilty of no contributory negligence. Without reviewing the testimony in detail, and after giving only proper weight to witnesses who were interested or displayed undue bias, it was of the opinion that the conflict between other witnesses as to the giving of fog signals was a conflict between positive and negative testimony, and did not discharge the burden resting upon libelant, and that the conflict as to speed, in the most favorable light to libelant, left the question in equilibrium, if it did not favor respondents' version. It said: "On the question of speed of the tug, it should be specially noted that there is one well-proved fact which shows that the speed was moderate, and that fact is that it was possible to save Bolds, the oarsman. and for Stewart to reach the young lady. I am convinced that, if the tug had been running at a high rate of speed, Stewart could not, especially in so dense a fog, have reached her as he did." "As to the failure to rescue the unfortunate young

lady after she had been thrown into the water, I believe that during the very brief and anxious moment when efforts were available the tug did what she could be expected and held to do under such circumstances."

There were 17 assignments of error; among them, that the court erred in dismissing the libel, in holding that the Leo was going at a slow rate of speed, in holding that she gave proper fog signals, in holding that she had a proper lookout as required by law, in not holding that Miss Quinette was a passenger on the skiff, in not holding that the custom of the port allowed her to cross the river without a fog signal and in not holding that the Leo failed in proper efforts to rescue Miss Quinette after she was thrown in the water.

Edwin T. Merrick, for appellant.

John D. Grace, John Clegg, and Lamar C. Quintero, for appellees.

Before SHELBY, Circuit Judge, and MAXEY and JONES, District Judges.

JONES, District Judge, after stating the facts, delivered the opinion of the court.

Witnesses, who, as far as we can judge from scanning their depositions, were of equal intelligence, equally disinterested, having equal opportunity and sense of hearing, and equally attentive, testified that fog signals were given, and that they were not given. There was other testimony, which, owing to the interest and evident bias of the witnesses, must be taken with much allowance. The most that can be said of the testimony upon this point is that it leaves the truth of the issue in doubt. The burden of proof being upon the libelant, the fault of the Leo in respect of fog signals is not established.

The assignment as to the want of a proper lookout has not been much insisted on. If it had been, it could not avail appellant. There was a lookout on watch, at his proper station. Moreover, he could not see the skiff before it was run down, owing to the density of the fog. The master, from his better point of observation in the pilot house, discovered the skiff before the lookout possibly could.

The conflict between the witnesses as to the Leo's speed is very pronounced. It is hard to reconcile their divergent testimony as a mere difference in judgment about the speed at which an object moved over the water. However, with the aid of the map and the photographer's art, and facts which are undisputed, we have been able to reach a satisfactory conclusion as to the speed at the time of the collision, without engaging in the unpleasant task of sifting mistake of fact from conscious untruth in this mass of testimony.

"Moderate speed" is purely a relative term, which means no more than that the vessel must run at a prudent rate of speed. Time, place, and circumstance, rather than the swiftness of the vessel over her course, determine whether the actual speed was immoderate, in that it was imprudent. In The Pennsylvania, 19 Wall. 135, 22 L. Ed. 148, the Supreme Court adopts the words of the Privy Council in the Europa:

"This may be safely laid down as a rule on all occasions—fog or clear, light or dark—that no steamer has a right to navigate at such a rate of speed

that it is impossible for her to prevent damage, taking all precautions at the moment she sees the danger to be possible; and, if she cannot do that without going at less than five knots an hour, then she is bound to go at less than five knots an hour."

The same rule, expressed in different words, was again approved by the Supreme Court in The Colorado, 91 U. S. 702, 23 L. Ed. 379, wherein it is said no rule yet suggested "for determining whether the speed of a steamer in any given case was or was not greater than was consistent with the duty the steamer owed to other vessels navigating the same waters is better suited to enable the engineer to reach a correct conclusion than the one adopted by the Privy Council. The Batavier, 40 Eng. L. & Eq. 25"—which is, "At whatever rate she [the steamer] was going, if going at such a rate as made it dangerous to any craft she ought to have seen and might have seen, she had no right to go at that rate." In Newton v. Stebbins, 10 How. 606, 13 L. Ed. 551, it is said:

"It may be a matter of convenience that steam vessels should proceed with great rapidity, but the law will not justify them in proceeding with such rapidity if the lives and property of other persons are thereby endangered."

In The Martello, 153 U. S. 70, 14 Sup. Ct. 725, 38 L. Ed. 637, it is said:

"While it is possible that a speed of six miles an hour, even in a dense fog, may not be excessive upon the ocean and off the frequented paths of commerce, a different rule applies to a steamer just emerging from the largest harbor on the Atlantic Coast, where she is liable to meet vessels approaching the harbor from at least a dozen points of the compass. Under such circumstances, and in such a fog that vessels cannot be seen more than a quarter of a mile away, it is not unreasonable to require that she reduce her speed to the lowest point consistent with good steerageway, which the court finds in this case to be three miles an hour."

In The Umbria, 166 U. S. 417, 17 Sup. Ct. 615, 41 L. Ed. 1053, it is said:

"The general consensus of opinion in this country is to the effect the steamer is bound to use only such precautions as will enable her to stop in time to avoid collision after the approaching vessel comes in sight, provided such vessel herself is going at the moderate rate of speed required by law. In a dense fog it might require both vessels to come to a standstill until the course of each was definitely ascertained. In a light fog it might authorize them to keep their engines in sufficient motion to preserve their steerageway."

True, these were cases of collision by steam or sailing vessels, and the language quoted was with reference to their duties to each other, and not with reference to the duty of a steamer to small craft like a skiff or yawl. It is also true, as argued, that neither a steamer nor a sailing vessel is ordinarily required to change its speed or course to avoid small craft, like a yawl or skiff, when it sees them, and that the steamer has a right to presume, until the contrary appears, that they will keep out of harm's way. The right of a steamer, however, to keep its course or speed, even against small craft, like a skiff or yawl, is relative and contingent, not absolute. The steamer has no right to maintain a speed or course which is dangerous to the safety of a smaller craft which can be seen ahead. There are, moreover, frequent occasions when

a steamer owes high duties as to speed not only to sail vessels and steamers, but to craft of any kind which it cannot see, if there be good reason to apprehend they may be ahead in its pathway. When the course of a steamer in a fog, on an inland highway of commerce, near a great port, takes it over waters which swarm with large vessels and smaller craft, which it can see only a few yards ahead, under conditions which may prevent the smaller craft from hearing or properly locating the steamer's fog signals, or from being misled by them, she is liable to run down the smaller craft at any moment unless her speed is very slow. Dwellers on the thickly settled banks of a navigable river have as much right to cross from one bank to the other in a skiff in a fog as steam tugs have to traverse the river at such a place during a fog; and, while the exigencies of commerce in many respects subordinate the rights of the smaller vessel and crafts, like bateaux, skiffs, and yawls, to the movements of the steamer, the more powerful vessel "is justly required to exercise extraordinary care and watchfulness when surrounded by feebler craft." The Nevada, 106 U. S. 159, 1 Sup. Ct. 238, 27 L. Ed. 149. The rules of navigation are enforced not only to secure the safety of the vessel which is commanded to conform to the particular rule, but also to prevent her increasing the danger to any other craft which may be put in peril by the failure to obey the rule. A steam vessel has no right, under the conditions prevailing at Nine-Mile Point, to act upon the theory that giving proper fog signals discharges her whole duty to vessels and craft which may be in her pathway in the fog. Slow speed and the utmost caution under such circumstances are of far more importance to small craft than the persistent sounding of fog signals. As said in the Konig Willem 1, 9 Asp. Mar. Cas. 300:

"Sound is conveyed in a very capricious way through the atmosphere. Apart from wind, large areas of silence have been found in different directions and at different distances from the origin of sound, even in clear weather. Therefore too much confidence should not be felt in hearing a fog-signal."

The time elapsing between the collision and the departure of the Leo from the ferry landing, and the distance traversed between the two points, conclusively show that her average rate of speed over her course must have exceeded six miles an hour. Her average speed, however, would not necessarily show her speed at any given point on the voyage. She was feeling her way in the fog, now and then taking her bearings by the echo of the whistle from the banks and by sighting the trees. In navigating in a fog under such conditions, the vessel, after assuring her position at any given point, most usually takes on greater speed, and continues it until she reaches the next point ahead, where she must again reduce her speed and feel her way. Evidently the skiff was struck at a stage in the voyage where the Leo was not feeling her way. She was then proceeding confidently ahead, on a course which she believed conformed to the lay of the shore, and would safely take her around Nine-Mile Point, with a speed which, but for the reversal of the engines when the skiff was sighted, would either have landed the tug with tremendous force against the lower end of the

raft, within 35 feet of the bank; or if, as her master thinks, her bow veered somewhat into the shore in consequence of going forward while her propeller was reversed, she would, but for sighting the skiff, have gone into the front of the raft a little further upstream, or, skirting it, would have run down the boathouse, which was moored on another part of the raft, about 45 feet out in the river. The distance of the skiff from the raft when first sighted is not by any means clear, under the testimony. The distance the tug traversed with its engines reversed after sighting the skiff was undoubtedly greatly more than the length of the Leo, and in all probability two or three times as great. Going ahead, as she was, upstream, with her powerful engine working full speed astern, if her speed at the time of the collision had been as slow as three or four miles an hour, as appellees contend, she would have stopped, after the engine was reversed, before reaching the raft, or, at all events, would not have struck the raft such a blow as the witnesses describe, and landed the skiff bodily out of the water upon the raft. Although the crew testified they felt and heard no jar or crash at that time when the binders were broken and the logs jammed, the noise of the crash was such that people near by were attracted to it, and others not so near heard it, and thought it proceeded from the opposite side of the river. Stewart was not on the tug when she struck the raft. The testimony of the rest of the crew on this point is unworthy of credit. They sought to prove that the lifeboat had been lowered at least to the deck, and that the canvas cover over it had been torn off. Nothing of the kind happened. This is abundantly proved not only by credible and disinterested witnesses, who pointedly called attention to the position of the lifeboat at the time, but by the master's own statement, and the correction made in his report. Some of the crew testified, although they were bound to know it to be untrue, that the skiff was put upon the raft by members of the crew after the tug returned from rescuing Bolds. All the disinterested witnesses and Stewart and Capt. Bisso state that the skiff was carried on the bow of the tug when it first struck the raft. It was there before the Leo came to the raft the second time. No one pretends that it was put on the raft by the crew when the tug first struck the raft. The whole proof shows the skiff could not have gotten on the raft in any other way than as stated by Stewart and Bisso.

Bearing in mind that the skiff was struck upon its port bow, and that on that side only were the sides and knees broken, while neither its starboard side nor bottom nor stern were injured at all, and that the nature of the fractures shows that the blow which struck the skiff ranged in the direction of its stern, and that the skiff started from the upper end of the raft, and was found deposited on the lower end of the raft, the theory that the tug may have struck the skiff just after the skiff turned into the shore, after passing and within a few feet of the lower corner of the raft, is not at all reasonable, under the evidence. It was only 100 yards from the middle of the raft, the point from which Bolds pulled out and commenced to row downstream, to the lower end of the raft.

136 F.—53

He had been rowing "five or ten minutes" when the skiff was struck, and he rowed at least three miles an hour, if not considerably more, according to the testimony. If Bolds had rowed directly down the stream, along the front of the raft, the time he was rowing would have carried him much further downstream than the lower end of the raft. If he abruptly turned the corner of the raft towards the shore as soon as he reached the end of the raft, the time he was rowing would have carried him, in a few seconds, right into the bank, only 60 feet distant, which it is not claimed or pretended he struck. As he did not row into the bank, he must have gone downstream. The time he was rowing shows, at any reasonable estimate, he had gotten at least 100 yards downstream below the raft, when the tug struck the skiff. If he was below the raft anywhere in the river, or if he was out in the stream above the raft, and rowing down to the point of the lower end of the raft, while the tug was approaching in the direction of the raft from any place in the stream where the evidence justifies us in placing the Leo, it is, in view of the nature of the injuries received by the skiff, possible to account for the collision in but one way; and that is by collision nearly head-on, while the tug was ascending and the skiff descending, somewhere below and in the vicinity of the lower corner of the raft. If Bolds had gotten downstream, and was rowing back upstream, the skiff could not have received the nature of the injuries it did on its port side. In that event the skiff would be below the raft, and would have been rowed upstream, and necessarily, according as the skiff was further out or closer in shore than the tug, would have crossed the course of the ascending tug either on the port or on the starboard side of the tug. If the skiff had crossed from the port side of the tug, the skiff must have been struck and injured on its starboard side. If, on the other hand, it crossed on the tug's starboard bow, the tug could not have inflicted, nor the skiff received, the nature and kind of injury the evidence shows. In a collision from crossing the starboard side of the tug, the force of the blow on the port side of the skiff must have smashed the stem of the skiff and broken the sides in the direction of its bow, and would not have inflicted breaks and rips on the port side, from the direction of the stem of the bow towards the stern of the skiff, as was the case.

Aside from the breaking of the binders on the raft, there is another significant fact bearing on the rate of speed. The ends of the logs, including the height of the heavy binders on top of them, rose a foot or more, perpendicularly, out of the water. The skiff itself sat at least five or six inches in the water. The skiff, being carried in on the bow of the tug, if actually impinged between such an obstacle and the tug—this part of the raft being practically immovable, owing to the length of the raft, half of which lay on the shore—would have been shattered to fragments, or at least its bottom and starboard side would have been fractured. The laws of matter do not permit us to doubt that such would have been the result if the skiff had been projected from the bow of the tug directly against such a perpendicular obstacle, as undoubtedly

would have been the case if the tug had been going at slow speed when its bow struck the raft. That the skiff was not injured in either of these respects can be accounted for only on the theory that the swiftness with which the tug approached upstream, the revolutions of the reversed propeller sending the waves in the same direction, against the side of the raft, made such a commotion in the water in front of the perpendicular point of contact made by the end of the raft as to cause the volume of the water there to act as a cushion, and lift the skiff, from where it rested on the bow of the tug, over the perpendicular obstacle of the side of the binders and end of the logs, and land it on the raft; the height of the binders preventing the skiff from going into the stream with the receding wave, which, after having spread out over the raft, returned with less volume and force than when it first went over the raft.

If the tug had passed at considerable speed, parallel to, and along the front of the raft, it might be, in such a situation, that the commotion in the water and undulation of the logs along the front of the raft would submerge that part of the raft on the water's edge, so that the skiff floating along there on the bow of the tug, while the logs were under the water, would, without itself being lifted above the normal level of the raft in the water, be taken up on that part of the raft as the submerged logs returned to their normal level above the water. Such measure of undulation would not be imparted to the logs midway of the side of the raft by any moderate speed of the tug. One end of this side of this raft rested firmly on the shore; the logs lying parallel to the shore, extending outward 60 feet into the stream at its other end. The logs were fastened and held together by long wooden binders, about eight inches in diameter, running at right angles across the logs, and securely pinned to them. As the shore end of the raft rested firmly upon the bank, and could not sink or give way at that end so as to conform to the elevation or depression of the center, which at the point where the tug struck the raft was at least 25 feet from the river end, the end furthest from the shore would necessarily be elevated or depressed, as the case might be, in a considerably greater degree than the center, to conform to its elevation or depression. A wave which would depress the raft a foot or more in the water, by washing over the raft from the point of the tug's approach, must have power enough, therefore, to sink the end of the raft furthest from the shore a still greater depth in the water. A wave of sufficient power to do this, as the tug struck the raft, perpendicularly, 25 feet from the river end, must have had a front of at least 50 feet, for it would spread nearly equally on each side of the bow of the tug; and the height of the wave, when we remember that the binders and logs sat normally a foot or more out of the water, and the skiff drew at least 5 or 6 inches of water, must have been at least 2 feet, to cause the raft to be so depressed in the center that the skiff, instead of being uplifted there, would merely have floated onto the raft when the undulation of the logs caused by the wave raised the raft to its normal level. So, also, if it be

argued that the binders were not snapped in twain by the direct force of the tug's blow upon them, but because the volume of the wave, caused by its coming up, going under the raft, elevating the center of the raft a foot or more above its normal level in the river, necessitated the end of the raft furthest from the shore to be uplifted a still greater distance in order to conform at that end to the elevation of the raft in the center, and that in consequence the binders were too weak to resist the strain of uplifting the weight of the logs at the river end, and were thus snapped, that theory would not solve the difficulty of accounting for the production of a wave heavy enough to bring about such results if the tug were proceeding at a slow speed at that time. It is manifestly certain, under all the circumstances, that the striking of the raft with its bow at about right angles, when the tug was moving upstream, on a smooth river, in still weather, could not produce a wave of sufficient power either to deposit the skiff on the raft, without striking against its perpendicular side, or to depress the raft sufficiently in the center so that the skiff would float over on the raft without coming in contact with the ends of the logs and sides of the binders, at the time when the tug collided with the raft.

The testimony of the master is positive, that on discovering the skiff ahead he did not give orders to change the course of the Leo, but only to back her at full speed astern. On cross-examination the master was asked about his distance from the shore, and how, if his estimate was correct, he could have struck the raft within about 37 feet of the shore after reversing on sighting the skiff. He answered, "In backing up, the tug may have swung in that way, sir, which could have happened." He was further asked, "How could the backing of the tug swing it in when it was going forward?" His answer was, "In turning her back, why, she would swing one way or the other—sometimes back the tug to port, or sometimes back the tug to starboard." If this surmise be correct, it is highly probable, in the course and with the speed of the tug at the time it sighted the skiff, that, had not the machinery of the tug been reversed on that account, it would have skirted the front of the raft, and ran down the persons in the boathouse, which was moored in the river, on the lower part of the raft, about 45 feet out in the stream, if the tug did not earlier strike some nearer point on the front of the raft. Every phase of the transaction at this time serves to illustrate the danger to which the Leo exposed the smaller craft by her speed along the bend. The whole record impresses us with the conviction that the master of the tug, being able, from his elevated position in the pilot house, to discover any large obstacle, which would loom 10 feet above the water, in time to prevent collision with it by stopping or veering his course, and, being thus assured of the safety of the tug, was very heedless of the safety of smaller craft, which could not be seen far ahead, and would not jeopardize his safety in case of collision with them, and was proceeding at a speed which threatened their destruction if they did not hear or failed to properly locate his fog signals,

and did not get out of his way. He was entirely familiar with the locality, and the conditions and dangers of navigation there. The great preponderance of the evidence shows that the time elapsing between the moment of the Leo's passing Westwego Ferry Landing and reaching the point of collision with the skiff could not have been much, if anything, over 20 minutes. The distance traversed between the two points was between 2½ and 3 miles. If the distance was 3 miles, and the time 20 minutes, this would give an average rate of speed of 9 miles an hour. If the distance be taken at 2½ miles, and the time 20 minutes, it would make a speed of something over 7½ miles an hour. Under the conditions prevailing that morning, while rounding Nine-Mile Point, the master being unable to tell how far he was from the banks or to accurately ascertain his course, the Leo was not entitled to maintain a greater rate of speed than to give her sufficient steerageway. We are all of opinion that her speed at the time of the collision with the skiff was immoderate.

It does not seem to us that the fact that Bolds was rescued, and that Miss Quinette was held up some time in the water before Stewart abandoned the effort to save her, militates against the finding of undue speed at the time of the collision with the skiff. If the version of the captain and most of the crew and that of Bolds be correct, the latter was picked up after the vessel backed astern out in the river, and after it had struck the raft. What was done, or the time taken to do it, after the collision with the skiff, when the tug had to first stop its forward momentum before its stern could be backed down the river, which was not done until the bow of the tug had first struck the raft a heavy blow, sheds little light on the speed of the tug at the time when, moving forward, it collided with the skiff. Consideration of these questions helps us, rather, only in approximating the distance the skiff was from the raft when the tug struck the skiff. As the stern of the tug, whose bow apparently struck the raft at right angles, was necessarily already 83 feet down the stream when the tug commenced to back, and as Bolds "was swimming and hollering out there, so they backed out there, and pulled me up in the tug," some minutes must have elapsed after the collision with the raft before Bolds was taken aboard over the stern of the tug. As the tug must have consumed some time in backing the distance necessary to reach the place where the skiff was struck, the facts that Bolds was saved, and that Stewart had an opportunity to go to Miss Quinette and hold her up some time, go to show, after making due allowance for the ordinary current in taking persons downstream, that the distance from the raft of logs to the point where the skiff was run down and Miss Quinette and Bolds were thrown in the water was, in all probability, two or three times greater than the length of the Leo. The time the tug seems to have been actually backing, as far as we can gather the time from the testimony, goes to show that its bow must have gone at least that distance from the raft, downstream, to reach the probable point of collision with the skiff. In the view we take of the case, it is unnecessary to decide whether there were

errors in extremis that would fasten liability on the libelees on this account, if not at fault in other respects.

The right of action here is given by article 2315 of the Civil Code of Louisiana, as amended in 1884, which declares that:

"Every act whatever of man which causes damage, obliges him by whose fault it happens to repair it; the right of this action shall survive in case of death in favor of the minor children or widow of the deceased or either of them, and in default of these in favor of the surviving father and mother, or either of them, for a space of one year from the death. The survivors above mentioned may also recover the damages sustained by them by the death of the parent and child, or husband and wife, as the case may be."

Without this statute the libelant could not maintain her libel. The statute must be applied in admiralty just as if the suit had been brought in the state courts, and any defenses which are open to the defendant under the jurisprudence of the state, if successfully maintained, will bar recovery under the libel. The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358; The Alaska, 130 U. S. 201, 9 Sup. Ct. 461, 32 L. Ed. 923; The Oregon (D. C.) 45 Fed. 62. In the Corsair, 145 U. S. 335, 12 Sup. Ct. 949, 36 L. Ed. 727, it is said that "this local law did not give a lien or privilege upon the vessel, and that nothing more was contemplated by it than an ordinary action according to the course of law as administered in Louisiana." Under the law of Louisiana, the deceased's negligence, directly and immediately contributing to the injury, is a good defense.

The libelees insist on the defense of contributory negligence; contending that it was gross negligence in Miss Quinette to venture out in the river, during the prevalence of such a fog, in a skiff, which must pass the track of ascending and descending steamers, without having and sounding a fog signal, and that the noise in rowing with patent rowlocks is in no wise an equivalent signal to that prescribed by the laws of navigation and pilot rules. The failure to sound the fog horn, under the facts disclosed by the record, would be a good defense to this libel if the deceased could be charged with contributory negligence in that respect. Rule 15 of the "pilot rules for the rivers whose waters flow into the Gulf of Mexico and its tributaries, adopted by the board of supervising inspectors of steam vessels March 1, 1897." The Albert Dumois, 177 U. S. 240, 20 Sup. Ct. 595, 44 L. Ed. 751. The noise made by the patent rowlocks is quite different from the sound made by fog horns, and cannot well be heard over the rumbling of machinery of a steamer, or distinguished from sounds of shore. From its nature, it is more likely to be swallowed up or confused in other sounds than the blast of a fog horn. Besides, the force of the sound waves the rowlocks put in motion is not as great as the disturbance in the atmosphere produced by the blowing of a fog horn, and certainly cannot be heard at as great a distance. It cannot be, therefore, accepted as an equivalent for the fog signal prescribed, which is really only carried forward in rule 15 from the statute. Whatever may be the custom of private individuals to venture in skiffs on the river, especially at a place like Nine-Mile Point, without sounding fog signals, in time of dense fog, it cannot operate to

change or displace those rules, or to absolve those to whom they are addressed from the legal consequences of disobedience to them.

Miss Quinette is not chargeable with any negligence which may have been committed by the owners of the skiff in failing to provide the fog horn or other equivalent signal, or because the oarsman did not use one in the fog, or was negligent, or made errors in navigation. The skiff belonged to her brother. The oarsman was his servant. Her brother directed the oarsman to row Miss Quinette over the river. Neither she nor libelant, so far as the evidence shows, had any interest in the skiff, or control over it or over the oarsman, or attempted to exercise any. Deceased was evidently alert, and did not hear the fog signal, and first perceived the tug coming through the fog, and instantly called the oarsman's attention to it. The law enjoins the duty of giving fog signals only upon those who control or navigate the skiff. Its commands are not addressed to guests, licensees, or passengers on the skiff, who neither control the skiff, nor take part in its navigation. The learning as to imputed negligence in cases of this kind is reviewed and exhausted by Mr. Justice Field in delivering the unanimous opinion of the Supreme Court of the United States in Little v. Hackett, 116 U. S. 366, 6 Sup. Ct. 391, 29 L. Ed. 652. In that case it was held that a person who hires a hack, and gives the driver directions as to the place where he wishes to be conveyed, but exercises no other control over the conduct of the driver, is not responsible for his acts or negligence, or prevented from recovering against the railroad company for injuries suffered from collision of its train with the hack, caused by the negligence of the managers both of the train and of the hack. The same doctrine is held in Louisiana. Perez v. R. Co., 47 La. Ann. 1391, 17 South. 869. The reason of the rule applies equally as forcibly to the case of a mere licensee in a private conveyance. Nesbet v. Garner, 75 Iowa, 314, 39 N. W. 516, 1 L. R. A. 152, 9 Am. St. Rep. 486; Masterson v. R. Co., 84 N. Y. 247, 38 Am. Rep. 510; Pyle v. Clark, 79 Fed. 744, 25 C. C. A. 190; B. & O. R. Co. v. Maryland, 79 Md. 355, 29 Atl. 518, 47 Am. St. Rep. 415.

Miss Quinette not being identified with the skiff or its management in anyway, can it be justly charged that her conduct in attempting to cross the river, under the circumstances, without seeing that there was a fog horn, was an act of such known danger and recklessness on her part as will legally condemn her as for personal contributory negligence? It is true, she was of age, and that the oarsman was young, and had but one eye. She had frequently crossed the river, presumably in this same skiff, and certainly with this oarsman, and, having lived at the Point nearly all her life, had doubtless been rowed over the river during the prevalence of a fog. The evidence shows that Bolds was a skilled oarsman and a man of character and prudence. He had long been a trusted servant in the family. The universal custom seems to have been for skiffs there not to carry or sound fog horns. Some of the witnesses testified they never heard of a skiff carrying a fog

signal. Indeed, five or six of the witnesses in this case were out in the river in skiffs as the Leo passed that morning, and none of them carried fog signals. Dwellers upon the banks of the river, according to the testimony, seem never to have regarded the crossing of the river in a skiff in time of fog, without fog signals, as a very dangerous undertaking. While their custom, as we have said, cannot affect the validity and force of the statute, or absolve those to whom the rules are addressed from the legal consequences of their violation of them, it is material, in this connection, in judging the recklessness of Miss Quinette's personal conduct in undertaking to cross the river.

The negligence sought to be visited upon Miss Quinette, is, in its last analysis, either that she did not see that the skiff had fog signals, or that, after ascertaining that it did not have fog signals, she nevertheless consented to be rowed across the river in a fog. She was under no duty to furnish the skiff with fog signals, and, clearly, her simple act in consenting to be rowed across the river, in the fog, in a skiff which she knew did not carry the fog signals, was not the proximate cause of her death, in view of the circumstances attending it. New and independent causes intervened between her going upon the skiff and the collision of the tug with it. Her act in going upon the skiff did not cause the immoderate speed of the tug, or prevent the oarsman from hearing or locating the fog signals, and nothing she did tended in the slightest degree to cause either the tug or the oarsman to lose their course in the fog. It was this succession of faults and errors, none of which her original act put in motion, which, combined with her act in consenting to be rowed across the river, brought about the collision. The speed of the tug, the failure to hear or locate its fog signals, and the errors of navigation were purely intermediate causes, not springing from her act of going on the voyage, and were self-operating, and were the last negligent acts contributing to the collision, and without which it would not have happened. Besides, Miss Quinette, who did not know when she started out that the Leo was coming in her direction, had a right to presume that a tug would not violate the rules by moving at an immoderate speed in the fog, and she was not charged with anticipating, so far as anything in the record shows to the contrary, that the oarsman would not hear the fog signals or the noise of an approaching tug, or would row directly across its bow. The ordinary and probable result of her act in taking passage in the skiff, which was well built and substantial, and in charge of a competent oarsman, whom she did not direct or control, was not that the skiff would be run down by the steamer. In view of the new, independent, and self-operating causes, which her act did not produce, her going upon the skiff, and consenting to be rowed across the river in the fog in a skiff which she knew did not carry fog signals, cannot, in any sense, be said to be the juridical cause of the catastrophe. Milwaukee R. Co. v. Kellogg, 94 U. S. 469–475, 24 L. Ed. 256; Insurance Co. v. Tweed, 7 Wall. 52, 19 L. Ed. 65.

In McGuire v. R. Co., 46 La. Ann. 1555, 16 South. 457, the Supreme Court of Louisiana said:

"It is difficult to adopt a standard of damages for loss of life. The law gives the surviving parent the damages the deceased could have recovered if he had survived the injury, and damages for the support the parent might have derived from the deceased. Her courts have allowed one thousand dollars up to five thousand dollars. Rarely more."

In that case the deceased was addicted to drink, and there did not seem much prospect of his contributing to the support of the parent who survived. The jury rendered a verdict for $20,000, and the court reduced it to $1,000.

In Ortolano v. R. Co., 109 La. Ann. 905, 33 South. 914, the parent recovered $10,000 damages for the negligent killing of the plaintiff's young son. The Supreme Court reduced the parent's recovery to $4,000. Administering a Louisiana statute as to a wrong occurring within its borders, involving its own citizens, we think we should be governed in the measure of damages by analogy to the decisions of its highest court under similar circumstances.

The decree dismissing the libel is reversed, and the case remanded to the District Court, with directions to decree in favor of the libelant, and to award her $4,000 as damages, and the costs of suit. The costs of the appeal will be taxed against the appellees.